**SHELL OIL COMPANY, Petitioner,**

v.

**Mohammed KHAN and Jamila Williams, Respondents.**

No. 02–0401.

Supreme Court of Texas.

Argued March 5, 2003.

Decided June 11, 2004.

David Vandiver Wilson, Troy Allen Williams, Hays McConn Rice & Pickering, Houston, TX, for Petitioner.

Stuart J. Starry, Marta Eugenia Montenego, Starry & Associates, Richard Eu-

gene Norman, Timothy J. Crowley, Crowley Douglas & Norman, LLP, Houston, TX, for Respondent.

Justice BRISTER delivered the opinion of the Court.

Once again, we consider when an oil company may be held responsible for crimes committed by third parties against an employee of a lessee-dealer. In *Exxon v. Tidwell*, we held the answer "depends on whether the oil company possessed a right of control over the safety and security of the station."[1] As we were adopting a new standard, we remanded for a new trial so the parties could present evidence directed to that standard.[2] In this case, we apply that standard to the evidence presented. Concluding there is no evidence the oil company here had a right to control security or premises conditions at the station, we reverse the court of appeals' judgment to the contrary and render a take nothing judgment.

## I. Background

Mohammed Khan worked for La Sani, Inc. at a gas station La Sani operated pursuant to a lease and dealer agreement with Shell Oil Company. During most of his night shift, Khan worked inside the station behind locked doors and bullet-proof glass, but his duties also required him to emerge and clean the outside areas of the station before the morning's heavy traffic began.

At approximately 4:15 a.m. on August 27, 1997, he was cleaning the service-bay areas when a man emerged from the shadows wearing a bandana over his face and carrying a rifle. Khan ran to the store, but was unable to close and lock the door before the assailant shot him in the left leg. The identity of the assailant is unknown.

Khan and his wife, Jamila Williams, filed negligence and gross negligence claims against Shell, La Sani, and Saleem Syed (La Sani's sole stockholder). Shell successfully moved for summary judgment on the basis that it owed Khan no duty, and the judgment became final upon severance from the claims against the remaining defendants. The court of appeals reversed, finding some evidence that Shell had a right to control certain security-related matters.[3] We apply the usual standard of review.[4]

■ Like the defendant in *Tidwell*, Shell had overlapping roles and duties as (1) premises owner pursuant to the lease, and (2) employer of an independent contractor pursuant to the dealer agreement.[5] Generally, the duties owed by premises owners and general contractors to employees of an independent contractor are the same.[6] In categorizing that duty, we have distinguished between injuries arising from activities and premises defects.[7] As

1. 867 S.W.2d 19, 20 (Tex.1993).

2. *Id.* at 20, 23.

3. 71 S.W.3d 890, 893–94.

4. *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003) (holding summary judgment review is de novo, taking all evidence, inferences, and doubts in non-movant's favor, and affirming only if no genuine issue of material fact exists and movant is entitled to judgment as a matter of law).

5. *See Tidwell*, 867 S.W.2d at 21; *see also Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex.1997).

6. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 n. 1 (Tex.1999).

7. *Olivo*, 952 S.W.2d at 527; *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex.1985).

both are asserted here, we address each in turn.

## II. Activities

■ Khan asserts Shell controlled several security-related activities at the station. With respect to activities, an owner or general contractor who retains a right to control an independent contractor's work may be liable for negligence in the exercise of that control.[8] Neither party here asks us to revisit this rule or has briefed any alternatives; accordingly, we apply it to these facts.[9]

■ Right to control may be shown by explicit contractual assignment or actual exercise of control.[10] Generally, the former is a question of law for the court and the latter a question of fact for the jury.[11]

■ The dealer agreement here specifically stated that La Sani was an independent contractor and Shell had no right to control operations:

> Dealer is an independent businessperson, and nothing in this Agreement shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, Dealer's business or operations conducted pursuant to this Agreement; but the entire control and direction of such business and operations shall be and remain in Dealer,

subject only to Dealer's performance of the obligations of this Agreement.

Khan argues the final phrase making an exception for La Sani's duties under the contract is "an exception that swallows the rule." That overstates the case. It is true that if the contract obligated La Sani to obey Shell's directions in every detail of security, this recital of independence would have to be ignored. But if the contract delegates security matters to La Sani, then its performance of that obligation does nothing to diminish its independence, or create liability for Shell.

■ We construe contracts as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.[12] No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.[13] Accordingly, we construe this provision as indicating La Sani had control of all operations (including security-related matters) unless other provisions of the contract clearly indicate the contrary. Khan asserts that several do.

### A

■ First, Khan points to the dealer agreement, which provided that La Sani

8. *Dow Chem. Co. v. Bright,* 89 S.W.3d 602, 607 (Tex.2002); *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex.2001).

9. *See Lee Lewis Constr.,* 70 S.W.3d at 783 (noting neither party challenged application of Restatement standard or argued for change in Texas law). *But see id.* at 787 (Phillips, C.J., concurring) ("Our focus on the degree of the general contractor's 'retained control' has failed to provide either consistent or equitable results."); *see also id.* at 789 (Hecht, J., joined by Owen, J., concurring) ("The retention of control over safety on a construction site is necessary, but not sufficient, to impose liabili-

ty on the general contractor for harm caused by an independent subcontractor. More is required.").

10. *Dow Chem.,* 89 S.W.3d at 606; *Coastal Marine Serv. of Tex., Inc. v. Lawrence,* 988 S.W.2d 223, 226 (Tex.1999).

11. *Lee Lewis Constr.,* 70 S.W.3d at 783.

12. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003).

13. *Id.*

would hire an "adequate and competent" staff.[14] Khan does not allege Shell actually exercised any control over hiring employees. But he does allege this part of the dealer agreement gave Shell the right to insist that La Sani hire a security guard, and blames Shell because none was. In other words, Khan asks us to construe a contract requiring *dealers* to hire an adequate number of competent employees to create liability for *Shell* if they do not.

Shell concedes it could have forced La Sani to hire a security guard by threatening to terminate the dealership. But a contracting party's right to order work stopped or fire an independent contractor for non-compliance does not create liability for everything the independent contractor does (or fails to do).[15]

■ Generally, an owner of land does not owe any duty to ensure independent contractors perform their work in a safe manner.[16] An owner may be liable if it specifies by contract a particular safety device and then approves operations that omit it.[17] But the contract here made no mention of security personnel, and delegated entirely to La Sani the duty to hire "adequate and competent" employees. This is not enough to show a contractual

right to control hiring, or to make Shell responsible because La Sani chose not to hire security personnel.

## B

■ Next, Khan alleges he was injured because he was not trained in robbery prevention. He asserts Shell had a right to control training, pointing to a provision in the dealer agreement requiring La Sani to train its employees,[18] and evidence that Shell distributed a training manual to all dealers and required them to take a training course that addressed security and other topics. For four reasons, this evidence is legally insufficient to show Shell had a right to control Khan's training.

First, as with staffing, the dealer agreement specifically delegated staff training to La Sani. There was no summary judgment evidence that Shell (1) knew La Sani routinely failed to train its employees, and (2) had a contractual right to intervene to correct it.[19] Accordingly, we cannot construe a contract requiring *dealers* to conduct training to create liability for *Shell* if they do not.

Second, we have held that a contract requiring independent contractors to comply with general safety practices *and train*

---

**14.** "Dealer shall maintain an adequate and competent staff of employees, considering both the volume and nature of the business activity, to fulfill efficiently Dealer's obligations hereunder."

**15.** *Dow Chem.*, 89 S.W.3d at 607–08 (citing Restatement (Second) of Torts § 414 cmt. c (1965)).

**16.** *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex.1998) (per curiam).

**17.** *See, e.g., Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469, 470 (Tex.1985) (per curiam).

**18.** "Dealer shall have the responsibility to train Dealer's employees, and shall have available and utilize training equipment, ma-

terials and programs as made available by Shell from time to time for this purpose."

**19.** *See Koch*, 11 S.W.3d at 157 (holding general contractor not liable unless a contractual provision gave it the right to take action upon learning subcontractor's employees were acting unsafely); *Hoechst–Celanese*, 967 S.W.2d at 357 ("[A]n employer who is aware that its contractor routinely ignores applicable federal guidelines and standard company policies related to safety may owe a duty to require corrective measures to be taken or to cancel the contract"); *Tovar*, 692 S.W.2d at 470 (holding general contractor liable when it knew of ongoing violation of specific contractual safety provision and failed to exercise contractual right to stop drilling).

*their employees to do so* cannot constitute a right to control job-site safety.[20] Instead, requiring subcontractor's employees to learn and follow general safety procedures subjects an owner only to a narrow duty to avoid increasing the risk of injury.[21] In this case, there is neither allegation nor evidence that Shell's materials or its insistence that La Sani train its employees increased any risk of injury to Khan.

Third, it is not enough to show that an oil company controlled some security activities if the ones it controlled had nothing to do with the criminal act that ultimately occurred.[22] Khan does not cite any errors or omissions in Shell's manual or training course; instead, his complaint is that he did not receive the same training. Because no errors or omissions in Shell's training or manual caused Khan's injuries, Shell's right to control them creates no nexus with the injuries Khan alleges.

Finally, while the manual excerpts in the record include measures that might be taken before and after robberies, they were clearly labeled as suggestions and recommendations.[23] We have held repeatedly (following the Restatement) that merely making recommendations is no evidence of a right to control.[24] Accordingly, Shell had neither contractual nor actual control of Khan's training.

## C

Both the lease and the dealer agreement required La Sani to keep the station open twenty-four hours a day. In *Tidwell*, we held the focus is not on who had the right to control general operations of the station, but on who had specific control over safety and security.[25] Control over general hours of operation necessarily falls in the former category rather than the latter. The contractual requirement for round-the-clock operation is no evidence that Shell controlled security at the station.

Khan further contends Shell was responsible for his presence outside during a dangerous time of night. He presented evidence (albeit hearsay) that Syed said Shell said the service-bay areas had to be cleaned before the morning rush-hour traf-

---

20. *Dow Chem.*, 89 S.W.3d at 611 (finding no right to control raised by allegation that subcontractor's employees were required to be "indoctrinated" with general contractor's safety rules); *Hoechst–Celanese*, 967 S.W.2d at 357–58 (finding no right to control in contractual provision requiring contractor to train its employees in general contractor's safety-related rules and regulations).

21. *Koch*, 11 S.W.3d at 156; *Hoechst–Celanese*, 967 S.W.2d at 357–58; *see Dow Chem.*, 89 S.W.3d at 611.

22. *Hoechst–Celanese*, 967 S.W.2d at 357 (requiring "*nexus*" between an employer's retained supervisory control and the condition or activity that caused the injury") (emphasis in original); *Olivo*, 952 S.W.2d at 528 ("or the general contractor to be liable for negligence, its supervisory control must relate to the condition or activity that caused the injury."); *Tidwell*, 867 S.W.2d at 23 ("he focus should be on whether Exxon had the right to control the alleged security defects that led to Tidwell's injury.")

23. "This information is provided to dealers and jobbers as a resource for their consideration as part of their ongoing development of station security procedures. Recipients should consider this manual as a possible component in their overall program, and should seek additional information relevant to their particular circumstances."

24. *See, e.g., Dow Chem.*, 89 S.W.3d at 611; *Koch*, 11 S.W.3d at 155 ("It is not enough that [the principal] has merely a general right to . . . make suggestions or recommendations which need not necessarily be followed."); *Redinger*, 689 S.W.2d at 418; Restatement (Second) of Torts § 414 cmt. c.

25. *Tidwell*, 867 S.W.2d at 23.

fic began. But while Shell may have mandated a particular result, there was no evidence Shell dictated who should do this work or when. A general requirement that work be done by a certain time is insufficient to show right of control.[26]

Finally, Khan asserts La Sani was required to report any criminal acts to Shell. It has long been the rule that a right to receive reports is not a right to control.[27]

In conclusion, Khan has presented no evidence that Shell had a right to control security-related activities at the station. As an independent contractor with sole control of safety and security operations, La Sani owed Khan a duty to conduct those operations with care, but Shell did not. The trial court properly granted summary judgment to that extent.

### III. Premises Defects

We turn next to Kahn's allegations concerning premises defects. In his response to Shell's motion for summary judgment, Khan asserted several conditions contributed to his injuries:

- *lighting:* the side of the building from which the robber emerged was dark;
- *surveillance:* the station had security cameras inside, but not outside;
- *glass:* the station had bullet-proof glass on the front windows and doors, but not on the sides;
- *signage:* the station had no signs advising that employees had access only to small amounts of cash; and

- *fencing:* there was no perimeter fencing.

The court of appeals held Shell had a contractual right to control these matters, and actually exercised that control.[28] We address each of these holdings in turn.

### A

In previous opinions, we have divided premises defects into two categories: (1) those existing when an independent contractor enters, and (2) those created by the independent contractor's work.[29] With respect to existing defects, an owner or occupier has a duty to inspect the premises and warn of concealed hazards the owner knows or should have known about;[30] with respect to defects arising later, an owner has no duty unless it retains a right to control the work that created the defect.[31]

In this case, all of the conditions listed above predated La Sani's lease, and thus fall within the existing-defects category. There is neither allegation nor evidence that any were concealed; to the contrary, Khan relies on their open and obvious nature in alleging each would have discouraged robbers. As no concealed hazards are alleged, when Shell relinquished possession of the premises, it also relinquished to La Sani the duty to warn of or eliminate any unreasonably dangerous premises defects that existed.

Nevertheless, the court of appeals held Shell retained a right to control these con-

---

**26.** *Dow Chem.,* 89 S.W.3d at 609 (holding general contractor's receipt of work schedule that parties could modify by agreement was no evidence general contractor had right to control who performed particular task at what point in time).

**27.** *Id.* at 606; *Redinger,* 689 S.W.2d at 418; Restatement (Second) of Torts § 414 cmt. c.

**28.** 71 S.W.3d at 893–94.

**29.** *Dow Chem.,* 89 S.W.3d at 606; *Coastal Marine,* 988 S.W.2d at 225.

**30.** *Olivo,* 952 S.W.2d at 527; *Coastal Marine,* 988 S.W.2d at 225; *Shell Chem. Co. v. Lamb,* 493 S.W.2d 742, 746 (Tex.1973).

**31.** *Dow Chem.,* 89 S.W.3d at 606; *Coastal Marine,* 988 S.W.2d at 225–26.

ditions because the lease allowed Shell to make alterations to the premises at any time, and prohibited La Sani from making alterations without Shell's prior written approval.[32] But as noted above, right-to-control issues arise only when a premise defect is created *after* a lessee enters possession; we have never held a lessor liable for pre-existing unconcealed defects merely because it retained a contractual right to make or approve of alterations.[33]

It is true landlords may be liable post-lease if they retain a right to control common areas, but liability there is based on physical possession. Though such cases often discuss "right of control," the liability question in them turns on who had possession of a part of the premises rather than a mere right of re-entry.[34]

■ The Restatement reflects this same distinction. Section 17.3 of the Restatement concerning landlords and tenants limits a landlord's liability based on right of control to cases in which physical possession is retained.[35] As the first comment to that section notes, a contractual right of re-entry is not enough:

> *a. Landlord's retained control.* The rule stated in this section applies not only to the hall, stairs, elevators and other approaches to the part of the property leased to the tenant as an apartment, office, or room in a tenement or boarding house, but also to such other parts of the leased property to the use of which by the express or implied terms of the lease the tenant is entitled, usually in common with other tenants, such as a bathroom in a boarding house and the roof or yard of a tenement building or apartment house.

> \* \* \*

> The rule stated in this section does not apply to any part of the leased property

**32.** 71 S.W.3d at 893.

**33.** *See, e.g., Brownsville Navigation Dist. v. Izaguirre,* 829 S.W.2d 159, 161 (Tex.1992) (holding lessor who relinquished possession of premises not liable for death of lessee's employee due to preexisting soil conditions as lessor had no right to control lessee's post-lease *operations* ).

**34.** *See Johnson County Sheriff's Posse, Inc. v. Endsley,* 926 S.W.2d 284, 286 (Tex.1996) (holding lessor not liable as it retained no control of dirt leased inside arena); *Kukis v. Newman,* 123 S.W.3d 636, 642 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (noting plaintiff did not contend landlord had control of staircase inside leased home); *Palermo v. Bolivar Yacht Basin, Inc.,* 84 S.W.3d 746, 750 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding lessor not liable as it retained no control of leased dock); *Am. Indus. Life Ins. Co. v. Ruvalcaba,* 64 S.W.3d 126, 138 (Tex. App.-Houston [14th Dist.] 2001, pet. denied) (holding plaintiffs presented no evidence landlord retained control of staircase inside office building); *Osti v. Saylors,* 991 S.W.2d 322, 327 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (holding landlord potentially liable for lack of fire escape outside three-story

apartment building); *Baker v. Pennoak Props., Ltd.,* 874 S.W.2d 274, 277 (Tex.App.-Houston [14th Dist.] 1994, no writ) (holding plaintiff presented no evidence landlord knew of vicious dogs in common areas of apartment complex where it retained control); *see also Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 325 (Tex.1993) (holding lessee liable for parking lot ramp outside leased building because by constructing ramp lessee exercised actual possession and control).

**35.** "A landlord who leases a part of his property and retains in his own control any other part the tenant is entitled to use as appurtenant to the part leased to him, is subject to liability to his tenant and others lawfully upon the leased property with the consent of the tenant or a subtenant for physical harm caused by a dangerous condition upon that part of the leased property retained in the landlord's control, if the landlord by the exercise of reasonable care could have: (1) discovered the condition and the unreasonable risk involved therein; and (2) made the condition safe." Restatement (Second) of Prop.: Landlord & Tenant § 17.3 (1977).

specifically transferred to the tenant under the lease with regard to which the landlord retains a right to inspect, to repair, or to enter for some other purpose. These parts of the leased property are not considered to remain under the landlord's control.[36]

We have addressed Khan's precise arguments before, and rejected them. In *Flynn v. Pan American Hotel Co.*,[37] the owner of the St. Anthony Hotel in San Antonio leased the entire property to another corporation to operate. The lessor retained the right to make repairs or improvements at will (and in fact made extensive renovations), and barred the lessee from making any changes without the lessor's written consent.[38] Nevertheless, when a hotel employee was injured in an elevator accident, we held the lessor could not be held liable because it did not retain a right to control any part of the premises:

> The terms of the lease, which have been stated, and the acts of the parties to the lease show that it was contemplated and intended that respondent should have the right to enter on the property to make improvements and repairs; but the reservation by a lessor of a right to

enter the premises to make such repairs and alterations as it may elect to make is not a reservation of control over a part of the building and an obligation on the part of the lessor to make repairs does not arise from the reservation of such right.[39]

Because the defect in *Flynn* was not concealed, we held the lessee assumed responsibility for existing defects, and the landlord was not liable to the lessee's employee.[40]

■ Texas law recognizes landlords have several duties with respect to premises turned over to tenants. As already noted, they have a duty to disclose concealed dangers,[41] and a duty of care as to common areas where they retain possession.[42] If they agree to make repairs, they have a duty to complete them with care.[43] But they do not become liable for existing premises defects merely by retaining the right to re-enter the premises to make alterations. The court of appeals erred in holding to the contrary.[44]

## B

■ Both the lease and the dealer agreement provided La Sani could not al-

36. *Id.* cmt. a.

37. 143 Tex. 219, 183 S.W.2d 446 (1944).

38. *Id.* at 449–50.

39. *Id.* at 451.

40. *Id.* at 448.In *Tidwell*, we said "when a landlord retains possession or control of a portion of the leased premises, the landlord is charged with the duty of ordinary care in maintaining the portion retained." *Tidwell*, 867 S.W.2d at 21 (citing *Flynn v. Pan Am. Hotel Co.*, 143 Tex. 219, 183 S.W.2d 446, 451 (1944); Restatement (Second) of Prop.: Landlord & Tenant § 17.3 cmt. 1). Standing alone, the disjunctive phrase "possession *or* control" might suggest landlords have the same duty of care if they retain *either* a right of control *or* a possessory interest. But our

reliance on *Flynn* and Restatement section 17.3—both of which state just the opposite— makes clear that was not our meaning.

41. *Olivo*, 952 S.W.2d at 527; *Coastal Marine*, 988 S.W.2d at 225; see also Restatement (Second) of Prop.: Landlord & Tenant § 17.1 (1977); Restatement (Second) of Torts § 358 (1965).

42. *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 515 (Tex.1978); *see also* Restatement (Second) of Prop.: Landlord & Tenant § 17.3; Restatement (Second) of Torts § 360 (1965).

43. *Flynn*, 183 S.W.2d at 448; *see also* Restatement (Second) of Prop.: Landlord & Tenant §§ 17.5 & 17.7 (1977); Restatement (Second) of Torts § 362 (1965).

44. *See* 71 S.W.3d at 893.

ter the station's buildings or equipment without Shell's prior written approval; the lease added that Shell's approval "could not be unreasonably withheld." There was no evidence La Sani requested any alterations after signing the contracts and entering into possession. But there was evidence La Sani asked Shell to make extensive upgrades during pre-contract negotiations. The court of appeals held this was enough to establish potential liability;[45] for two reasons, we disagree.

First, the court of appeals was incorrect that Shell had a duty to make the premises safe *before* turning the property over to La Sani. As noted above, a lessor has a duty to *disclose* concealed hazards before relinquishing possession, but no duty to *remedy* all of them.[46]

Second, Syed's proposal was not for safety upgrades, but for complete remodeling of the station. While one aspect was "proper exterior illumination," Syed's goal was, in his own words, "to remodel this station into a C–Store after which same location will bring a lot more gasoline business as well as grocery.... Study shows that neat, clean and well lit environment always attracts customers especially female customers feel more safer [*sic*]." While one aspect of his proposal was "proper exterior illumination," it also included extensive renovations unrelated to safety, such as "nicer landscaping" and "well-maintained restrooms." Nowhere in the proposal does Syed offer to pay for the remodeling. Shell's representative testified the proposal was rejected because Shell did not want to spend $100,000 of its own money so Syed could have a more profitable store. While Shell had a contractual right to approve any alterations

La Sani requested to provide a safe workplace, nothing in the contract required Shell to pay for such alterations.

As Shell retained a contractual right to approve or refuse a lessee-dealer's proposals for renovation, we agree there may be circumstances in which it could be liable for negligent exercise of that duty. But in this case Shell's duty never came into play because La Sani never requested any changes after the contract was signed. Accordingly, the court of appeals erred in holding Shell's refusal to comply with Syed's request rendered it potentially liable to Khan.

## IV. Conclusion

In conclusion, Khan has presented no evidence that Shell had a right to control either security-related activities or premises conditions at the station. The trial court properly granted summary judgment, and the court of appeals erred by reversing. We accordingly reverse the court of appeals' judgment and render judgment that Khan take nothing.

Prop.: Landlord & Tenant § 17.1; Restatement (Second) of Torts § 358.

---

45. *Id.*

46. *Olivo,* 952 S.W.2d at 527; *Coastal Marine,* 988 S.W.2d at 225; Restatement (Second) of