In The



Court of Appeals



Ninth District of Texas at Beaumont



 ______________________ 


 

NO. 09-08-136 CV


 ______________________



THE HOUSING AUTHORITY OF THE CITY OF BEAUMONT, Appellant



V.



BERNADETTE LANDRIO, INDIVIDUALLY AND AS PARENT 


AND NATURAL GUARDIAN OF D.S.; IDA FAYE GUIDRY, 


INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN 


OF M.J.W.; MARY FRANCES SIAS, INDIVIDUALLY AND AS PARENT 


AND NATURAL GUARDIAN OF S.S.; AND CAROLE CONWAY, 


INDIVIDUALLY AND AS PARENT AND 


NATURAL GUARDIAN OF D.C.T., III; Appellees


 




On Appeal from the 60th District Court


Jefferson County, Texas


Trial Court No. B-160,224






OPINION


 The Housing Authority of the City of Beaumont (BHA) appeals the denial of its plea
to the jurisdiction. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (Vernon 2008). 
Plaintiffs Bernadette Landrio, Ida Faye Guidry, Mary Frances Sias, and Carole Conway,
individually and on behalf of their minor children, claim their children were injured by
exposure to lead-based paint at BHA-owned apartments. (1) Plaintiffs contend BHA knew or
should have known of the lead paint hazard at the apartment complexes. The trial court
denied BHA's plea to the jurisdiction. BHA argues the trial court erred because plaintiffs
(1) failed to establish that they provided timely written notice, or that BHA had "actual
notice" of the injuries under section 101.101 of the Texas Civil Practice and Remedies Code;
(2) failed to establish waiver of BHA's immunity under the Texas Tort Claims Act; and (3)
failed to offer sufficient evidence to show that exposure to lead paint at the BHA-owned
premises proximately caused the children's injuries. On the record presented, disputed
jurisdictional fact issues preclude granting BHA's plea. We therefore affirm the trial court's
order. 

Governmental Immunity And Disputed Jurisdictional Facts


 A governmental unit generally is immune from suit unless that immunity has been
waived. See Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225-26 (Tex.
2004); Tex. Dep't of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam); Brenham
Hous. Auth. v. Davies, 158 S.W.3d 53, 56-57 (Tex. App.--Houston [14th Dist.] 2005, no
pet.). The Texas Tort Claims Act waives governmental immunity to suit in certain specified
circumstances. See Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021-101.029 (Vernon 2005
& Supp. 2008). Under the Act, immunity to suit is waived only to the extent immunity from
liability is waived; the two immunities are co-extensive under the statute. See Tex. Civ.
Prac. & Rem. Code Ann. § 101.025(a) (Vernon 2005); Miranda, 133 S.W.3d at 224. 

 Unless waived, a governmental unit's immunity from suit deprives a trial court of
subject matter jurisdiction. Miranda, 133 S.W.3d at 224; Jones, 8 S.W.3d at 638. A housing
authority is a governmental unit and has the right to an interlocutory appeal of a trial court's
denial of a plea to the jurisdiction. Tex. Loc. Gov't Code Ann. § 392.006 (Vernon Supp.
2008); Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). Appellate review of a trial
court's ruling on a plea to the jurisdiction is de novo. Miranda, 133 S.W.3d at 226. 

 In addressing the jurisdiction issue, an appellate court does not decide disputed facts
intertwined with the merits of the underlying claim. See Bland Indep. Sch. Dist. v. Blue, 34
S.W.3d 547, 554-55 (Tex. 2000). Whether a pleading or undisputed evidence demonstrates
a trial court's jurisdiction is a question of law. Miranda, 133 S.W.3d at 226. 

 The pleadings are to be construed in the plaintiff's favor. County of Cameron v.
Brown, 80 S.W.3d 549, 555 (Tex. 2002). If the pleadings are not sufficient to affirmatively
demonstrate the trial court's subject matter jurisdiction, but the pleading deficiency
nevertheless appears curable, "the issue is one of pleading sufficiency and the plaintiffs
should be afforded the opportunity to amend." Miranda, 133 S.W.3d at 226-27 (citing
Brown, 80 S.W.3d at 555). If the pleadings affirmatively negate the existence of subject
matter jurisdiction, "then a plea to the jurisdiction may be granted without allowing the
plaintiffs an opportunity to amend." Id. at 227. 

 If jurisdictional evidence is undisputed, the trial court rules on the plea as a matter of
law. Id. at 228. But when disputed evidence of material jurisdictional facts implicates the
merits of the case, the facts must be determined by the fact finder before the plea can be
granted. See Id. at 227-28.

 Elevated Lead Levels


 Plaintiff Bernadette Landrio's son was born on June 17, 1996. The Landrios lived in
apartment number 14 of Magnolia Gardens from November 14, 1997, through January 2001. 
At orientation prior to moving in, Landrio obtained and read information entitled "Protect
Your Family from Lead in Your Home" and "The Danger of Lead Poisoning to Renters." 

 Landrio's son was diagnosed with elevated blood lead levels on February 23, 1998,
May 6, 1998, and August 6, 1998. Landrio did not recall seeing him ingest paint while living
at the apartments. In February 1998, Landrio complained to someone in the apartment
manager's office about her son's elevated blood lead level, and requested a transfer out of
the complex. The individual told Landrio there were alternative "'ways [to] deal with lead,'"
and gave Landrio pamphlets about eating fruits and vegetables. While in the office, Landrio
also told Jimmy Jackson, the apartment manager, that her son had high lead levels and that
she wanted to be moved from the complex. Jackson told Landrio that he would "'go check
out the apartment.'" 

 Plaintiff Mary Frances Sias's daughter was born on April 22, 1996. Mother and
daughter lived in Concord Homes, first in apartment number 146 and later in apartment
number 149 from May 1996 through January 1999. Mary Sias recalled reading documents
warning of lead paint at an orientation session. 

 Sias's daughter was diagnosed with elevated blood lead levels on April 22, 1998, and
July 20, 1998. Although Mary Sias did not verbally report her daughter's elevated blood lead
level diagnosis to BHA personnel, her attorney sent BHA a letter regarding her claim on
October 16, 1998, within six months of the diagnosis. Mary Sias could not recall seeing her
daughter put paint in her mouth. She complained to apartment personnel that paint was
peeling in her apartment, but could not recall when she made the complaint.

 Plaintiff Ida Faye Guidry's daughter was born on May 28, 1994. They lived in
apartment number 24 of Concord Homes until about October 1997, and in apartment number
13 from approximately October 1997 to November 1999. When Guidry first leased at
Concord Homes, and at each renewal, she received documents from BHA entitled "Watch
Out for Lead Paint Poisoning" and "The Danger of Lead Poisoning to Renters." The
documents informed the residents of possible lead paint in BHA-owned apartments. In 1993,
she also received a document from BHA entitled "Lead-Based Paint, a Threat to Your
Children." 

 Guidry's daughter was diagnosed with elevated blood lead levels on January 20, 1998,
January 30, 1998, and February 20, 1998. Guidry testified that her daughter put paint in her
mouth in January or February of 1995 while they were living at the apartments; the daughter
was eight or nine-months-old at the time. Guidry removed a quarter-sized paint chip from
her daughter's mouth, but did not know if she swallowed paint on that occasion or any other. 
Guidry recalled seeing paint chips on the floor and paint peeling from the living room wall.
Her daughter began running fever and Guidry took her to a doctor. Although the doctor did
not tell Guidry the reason for the fever, Guidry believed the sickness resulted from the paint. 

 Guidry testified that in January 1998 she had a conversation with Ernest Wilson, a
BHA employee, in the apartment manager's office. She told him that her daughter had put
a paint chip in her mouth in 1995 and "it made her sick," and reported her daughter's
elevated lead levels. Guidry also testified that in May 1998 she received a letter from the
City of Beaumont regarding lead exposure and eating fruits and vegetables. For some period
of time after she told Wilson about the paint chip, Wilson gave Guidry a $30 allowance every
two weeks to purchase fruits and vegetables.

 Plaintiff Carole Conway's son was born on October 29, 1994. They lived in
apartment number 39 in Concord Homes from June 1996 to February 1999. She saw her son
eat paint chips in 1996 while they were living in the apartments. He was diagnosed with
elevated blood lead levels on December 16, 1996, January 2, 1997, August 4, 1997, March
24, 1998, and August 11, 1998. In early January 1997, she informed Jackie Flanagan that
her son tested "positive for lead." Two or three days later, she told apartment manager
Jimmy Anderson that her son tested positive for lead and that she had seen him eat paint
chips. The next day, she provided a copy of the test results to the BHA employee at Will
Jackson's request. In February or March of 1997, Conway told Tammy Williams with BHA
that her son had tested positive for elevated lead levels and that she had given his test results
to Jackson. In May or June of 1997, when Conway was re-certified for her apartment, she
received a lead warning packet from BHA and again mentioned her son's prior elevated lead
levels. 

Section 101.101 and This Court's Jurisdiction


 Section 101.101 of the Texas Civil Practice and Remedies Code provides that:

 (a) A governmental unit is entitled to receive notice of a claim against
it under this chapter not later than six months after the day that the incident
giving rise to the claim occurred. The notice must reasonably describe:

 (1) the damage or injury claimed;

 (2) the time and place of the incident; and 

 (3) the incident.


Tex. Civ. Prac. & Rem. Code Ann. § 101.101(a) (Vernon 2005). Proper notice assures
prompt reporting of claims, allows governmental units to gather information necessary to
guard against unfounded claims, and enables settlement or preparation for trial. City of
Houston v. Torres, 621 S.W.2d 588, 591 (Tex. 1981).

 The notice requirements of subsection (a) "do not apply" if the governmental unit has
"actual notice . . . that the claimant has received some injury[.]" Tex. Civ. Prac. & Rem.
Code Ann. § 101.101(c) (Vernon 2005). "Actual notice" includes subjective awareness by
the governmental unit that its fault produced or contributed to the claimed injury. See Tex.
Dep't of Criminal Justice v. Simons, 140 S.W.3d 338, 348 (Tex. 2004); see also Tex. Civ.
Prac. & Rem. Code Ann. § 101.101. "[A]ctual notice is a fact question when the evidence
is disputed." Simons, 140 S.W.3d at 348. 

 The Supreme Court held in Univ. of Tex. S.W. Med. Ctr. at Dallas v. Loutzenhiser,
140 S.W.3d 351, 364 (Tex. 2004), that lack of notice does not deprive the trial court of
subject matter jurisdiction. However, the Legislature subsequently amended Section 311.034
to provide that effective September 1, 2005, notice is a jurisdictional requirement in all suits
against a governmental entity. See Tex. Gov't Code Ann. § 311.034 (Vernon Supp. 2004),
amended by Act of May 25, 2005, 79th Leg., R.S., ch. 1150, § 1, 2005 Tex. Gen. Laws 3783
(current version at Tex. Gov't Code Ann. § 311.014 (Vernon Supp. 2008)); Tex. Dep't of
Criminal Justice v. Simons, 197 S.W.3d 904, 907 (Tex. App.--Beaumont 2006, no pet.). 
Appellees argue that section 311.034 should not be applied retroactively, and therefore this
Court lacks jurisdiction to consider the notice issue in this interlocutory appeal. 

 We held otherwise in Simons. 197 S.W.3d at 907. We considered the 2005
amendment to work a procedural change, because "[a] claimant who has not given either
timely written notice or actual notice has no vested right to recover under the [Texas Tort
Claims Act], and the amendment merely enables the governmental entity to appeal the issue
before entry of a final judgment rather than after." See id. Our decision in Simons conflicts
with another court of appeals' decision on the issue. See Tex. Tech. Univ. Health Sciences
Ctr. v. Lucero, 234 S.W.3d 158 (Tex. App.--El Paso 2007, pet. denied). In Lucero, the court
characterized the notice requirement as "unwaivable," because the requirement is now
jurisdictional after the 2005 amendment, and therefore the court presumed the Legislature
did not intend for the amendment to apply retroactively. Id. at 166. We are not persuaded
that notice would necessarily be "unwaivable" under all circumstances simply because notice
under the amended statute is now jurisdictional. See, e.g., Reata Constr. Corp. v. City of
Dallas, 197 S.W.3d 371, 375 (Tex. 2006) ("We have previously discussed the possibility that
a governmental entity might waive its immunity by certain actions, even absent a legislative
waiver of immunity."). We decline the request to revisit our decision in Simons. We
overrule appellees' challenge to this Court's jurisdiction to address the notice issue in this
interlocutory appeal. See Simons, 197 S.W.3d at 907. The Notice Dispute


 In its first issue, BHA argues the trial court erred because plaintiffs failed to establish
timely written notice or actual notice. Plaintiffs asserted BHA had actual notice of the
occurrences that are the basis of the suit. Counsel for plaintiffs Conway, Guidry, and Sias
sent a letter on their behalf to BHA on October 16, 1998, and for Landrio on December 4,
1998. The letters stated that they served to provide BHA with additional notice (pursuant to
section 101.101 of the Texas Tort Claims Act) of the plaintiffs' claims regarding lead
exposure at the housing complexes. The letters further stated: (1) the apartments where the
plaintiffs resided were contaminated, resulting in plaintiffs' high lead levels; (2) the adult-plaintiffs had been notified that their children suffered from elevated blood lead levels; and
(3) that actual notice of the condition had previously and timely been given to BHA through
its agents and employees. The letters asserted BHA had actual knowledge of the existence
of lead in the housing complexes, and BHA had "refused to undertake any steps to protect
those persons similarly situated as [minor-plaintiffs]." 

 Plaintiffs produced for the trial court a document dated "12/96" and entitled
"Beaumont Housing Authority[:] The Danger of Lead Poisoning to Renters." The document
stated, in part, the following:

 This housing or apartment was built before 1950. There is a
possibility that it may contain lead paint. Lead paint is
poisonous if eaten. Many children do eat paint flakes and
frequently become very sick. You as a parent are in the best
position to safeguard your child's health by preventing him or
her from eating paint or paint chips. This pamphlet will answer
some of your questions about how to know if your child has
been eating lead paint and what to do about it.

 

 . . . . 

 

 The most common cause of lead poisoning is lead-based paint. 
Children can get dangerous amounts of lead from eating even
very small amounts of such paint. Unfortunately, usually there
are no obvious signs of lead poisoning. Often lead poisoning
can seem like a number of other childhood diseases, but if your
child has stomach aches and vomiting, has headaches, a loss of
appetite, is cranky or frequently is too tired to play, he may have
lead poisoning. Any or all of these symptoms can be signs of
lead poisoning. Often, there are no symptoms at all. . . . 

 

 Blood screening programs are usually free and will test children
for lead even if they show no symptoms of poisoning and have
not been seen eating paint. . . . 


 . . . .

 

 If tests show that your child has a high level of lead in his blood,
he will need medical supervision and possibly treatment. If
treatment is necessary, your doctor, a local clinic, or hospital
will be able to remove the lead in your child's blood. Such
treatments may be paid for by Medicaid or your local health
department. If testing shows that your child has a lot of lead in
his blood, your local health department may send someone to
measure the lead paint in your home, and may require treatment
by the owner of the unit of the lead paint hazards on walls and
woodwork. . . . 


 . . . .

 

 You should stop your child from eating or chewing paint and
other objects that may contain lead. Warn your child of the
dangers of eating anything other than food if he is old enough to
understand. . . .


Plaintiffs also offered deposition testimony from Judith Ann Cobble Stansbury, an employee
of BHA from 1989 to 1996. Stansbury's deposition testimony was from an unrelated claim
against BHA. She was employed as the secretary to the executive director of BHA, and the
assistant to the Comprehensive Improvement Assistance Program (CIAP) Director. On some
occasions when the CIAP Director position was vacant, Stansbury assumed the director's
responsibilities. CIAP involved major renovations for BHA-owned apartment complexes,
and Stansbury's responsibilities included making requests for grant money for renovations. 
According to Stansbury, HUD mandated testing for lead-based paint in all BHA's complexes. 
She testified that in 1993 or 1994, the tests results for Magnolia Gardens and Concord Homes
showed high levels of lead. Stansbury's testimony, when considered with the BHA
document stating that "[m]any children do eat paint flakes and frequently become very
sick[,]" presented the trial court with some evidence BHA knew lead in the apartments could
contribute to elevated blood lead levels in children who lived in the apartments. 

 According to Bernadette Landrio's testimony, the same month that her son was first
diagnosed with elevated blood lead levels, she informed BHA's apartment personnel of his
condition and of the injury claimed. Plaintiff Ida Guidry had knowledge that her daughter
put paint in her mouth in early 1995. There is some evidence Guidry did not have knowledge
that her daughter had high levels of lead in her blood until January 1998, however. Guidry
testified that in January 1998 she notified apartment personnel of what happened and the
injury claimed. Plaintiff Mary Frances Sias' daughter was first diagnosed with elevated
blood levels in April 1998. Although Sias did not recall seeing her daughter eat paint chips,
she did report paint peeling in her apartment, and her attorney did provide written notice of
the claim within six months of the diagnosis. Plaintiff Carole Conway witnessed her son eat
paint chips in 1996. He was first diagnosed with elevated blood lead levels in December
1996. In January 1997, Conway informed apartment personnel of the diagnosis and of
Conway's having seen him eat paint chips. 

 The trial court was presented with some evidence that the plaintiffs informed BHA
of the diagnoses within six months of learning of the elevated lead levels. Nevertheless,
BHA argues plaintiffs were required to give notice of the claims of legal responsibility within
six months of an incident, not simply the diagnosis of high lead levels in the blood. Relying
on Sanford v. Texas A&M University, 680 S.W.2d 650 (Tex. App.--Beaumont 1984, writ
ref'd n.r.e.) and Putthoff v. Ancrum, 934 S.W.2d 164 (Tex. App.--Fort Worth 1996, writ
denied), BHA also contends the discovery rule does not apply to the notice provisions under
the Texas Tort Claims Act. 

 In Sanford, the plaintiff was exposed to a strong pesticide while he was working as
a telephone repairman on the premises of Texas A&M University Agricultural Research and
Extension Center on June 29, 1975. Sanford, 680 S.W.2d at 651. Almost immediately, he
experienced symptoms from the exposure, and he complained of fainting spells and dizziness
over the next five years. Id. None of the numerous doctors he consulted during this period
told him his medical problems were related to the June 1975 exposure. Id. After
experiencing kidney trouble, Sanford consulted a doctor in September 1980. The doctor
related his medical problems to the June 1975 exposure. Id. Appellant sued Texas A&M
University, Texas A&M University Agricultural Research and Extension Center, and Katy
Pest Control, for personal injuries under the Texas Tort Claims Act. Id. at 650-51. Texas
A&M University and the Agricultural Research and Extension Center filed a motion for
summary judgment based on the two-year statute of limitations and the six-months notice
provision in the Texas Tort Claims Act. Id. at 651. The trial court granted the motion for
summary judgment. Id. This Court found no evidence that a notice of claim for injury was
given within six months of June 29, 1975, and held that the discovery rule is not applicable
"to the instant cause of action[.]" Id. at 652. 

 In Putthoff, parents sued Tarrant County and two Tarrant County medical examiners
for damages caused by an alleged negligently performed autopsy of their child. Putthoff, 934
S.W.2d at 166. The child died on March 19, 1991, of asphyxiation. Id. Believing the child
had been murdered, the parents hired a pathologist to exhume the body and perform an
examination to independently determine the cause and manner of death. Id. at 167. The
pathologist could not find certain body parts that had allegedly been sewn up in decedent's
body, but found that the decedent's death was "'suspicious of a homicide by asphyxia.'" Id. 
The county contended the parents' causes of action were barred because the parents failed
to provide the county with timely notice of the claim. Id. at 173. The Second Court of
Appeals held that the parents' claims were barred as a matter of law, because it was
"undisputed" that written or actual notice was not provided to Tarrant County within six
months of the incident giving rise to the parents' assertion of a claim for negligence. Id. at
174. 

 The plaintiffs in Sanford and Putthoff alleged damage from a distinct incident on a
date certain from which to measure the sixth-month notice requirement. See Tex. Civ. Prac.
& Rem. Code Ann. § 101.101(a). In contrast, the information BHA provided the parents
informed them of the availability of blood screening and stated, "If testing shows that your
child has a lot of lead in his blood, your local health department may send someone to
measure the lead paint in your home, and may require treatment by the owner of the unit of
the lead paint hazards on walls and woodwork[.]" 

 The statute does not require notice of a nonexistent claim. See Loutzenheiser, 140
S.W.3d at 356-57. The diagnosis of a high level of lead in the child's blood was the incident
that gave rise to a claim against BHA. Under the circumstances in this case, the incident
subject to the notice requirement of the Texas Tort Claims Act ("TTCA") was the diagnosis
of increased lead levels in the blood. No injury claim of elevated blood lead levels existed
until that determination was made. 

 If the evidence at trial establishes BHA knew the apartments in fact had lead paint that
would likely be ingested by the children, a report of high blood levels in a child would
provide sufficient information to BHA that an injury may have occurred on which a claim
of BHA's fault in failing to repair the condition might be made. BHA's notices to the
plaintiffs of possible lead-based paint exposure, the testimony of Judith Stansbury, and the
plaintiffs' testimony raise a fact question to be resolved by the fact finder as to whether BHA
had a subjective awareness that the condition of the premises may have caused or contributed
to the claimed injuries. 

 Disputed jurisdictional fact issues are intertwined in this case with the merits of the
fault claims. The evidence before the trial court raised jurisdictional fact issues to be
resolved by the fact finder as to whether BHA had timely notice of the condition of the real
property, fault, and the claimed injuries of the plaintiffs. See Tex. Civ. Prac. & Rem. Code
Ann. § 101.101. The pleading deficiencies are curable, and plaintiffs should be afforded an
opportunity to amend their pleadings. See Miranda, 133 S.W.3d at 226-27. 

 Issue one is overruled. 

Waiver of Immunity For Premises Defect

 BHA argues in its second issue that plaintiffs have no viable premises liability claims
under section 101.021(2) of the Texas Civil Practice and Remedies Code. A plaintiff must
plead facts sufficient to invoke a waiver of governmental immunity under the TTCA. See
County of Cameron v. Brown, 80 S.W.3d at 555; Univ. of N. Tex. v. Harvey, 124 S.W.3d 216,
222 (Tex. App.--Fort Worth 2003, pet. denied). We consider the language of the TTCA and
then determine whether the liability theories pleaded and the jurisdictional evidence
presented demonstrate a claim falling within the TTCA's waiver of immunity. See Univ. of
N. Tex., 124 S.W.3d at 222.

 Plaintiffs alleged that the following acts or omissions by BHA constituted negligence:

 1) Exposing Plaintiffs to hazardous material, lead;

 2) Failing to warn of the dangers of lead poisoning;

 3) Failing to take proper safety precautions, including abatement;

 4) Failing to warn of the hazards of lead exposure;

 5) Failing to advise Plaintiffs of the symptoms and treatment of lead
poisoning; 

 6) Failing to inspect the rental premises for lead based paint and/or
materials prior to Plaintiff's habitation of said premises;

 7) Breaching the warranty of habitability;

 8) Failing to maintain the premises in which Plaintiffs were living; [and]

 9) Failing to comply with the requirements of applicable building,
housing, and health codes[.]


Plaintiffs argue BHA should have repaired the known hazardous defects. 

 BHA argues it did not breach any duty to plaintiffs to remedy the condition because
BHA warned plaintiffs about the possible presence of lead-based paint on the premises, and
the possible defect was not concealed. BHA also maintains that the lease agreements
between the plaintiffs and BHA required the plaintiffs to immediately provide to
management written notice of any need for repairs or any unsafe conditions on the premises
which might lead to injury or damage, and that BHA had a duty to make repairs only on
receipt of notice.

 The TTCA permits suit against governmental units for personal injuries caused by,
among other things, the condition of real property, "if the governmental unit would, were it
a private person, be liable to the claimant according to Texas law." See Tex. Civ. Prac. &
Rem. Code Ann. § 101.021(1)-(2) (Vernon 2005), § 101.022 (Vernon Supp. 2008); Perez
v. City of Dallas, 180 S.W.3d 906, 910 (Tex. App.--Dallas 2005, no pet.); Lamar Univ. v.
Doe, 971 S.W.2d 191, 195 (Tex. App.--Beaumont 1998, no pet.). The TTCA also provides
that when the condition of real property giving rise to the waiver of immunity is a premises
defect, generally a governmental unit owes to the claimant only the duty that a private person
owes to a licensee on private property. Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a). 
This limitation of duty under section 101.022 does not apply if the claimant pays for the use
of the premises. Id. 

 Plaintiffs paid for the use of the apartments. The duty owed here is defined by the
relationship of the parties as lessor and lessee, as it would be if the government unit were "a
private person." See Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2); Davies, 158 S.W.3d
at 59. Generally, with certain exceptions, a lessor's liability for conditions on leased
premises ends with transfer of possession and control to the tenant. See id. However, if the
lessor has contracted to keep the leased property in repair, the lessor may be liable to the
tenant, and possibly others on the property with the tenant's consent, for the failure to
exercise reasonable care to complete the repair. See Shell Oil Co. v. Khan, 138 S.W.3d 288,
297 (Tex. 2004); Harvey v. Seale, 362 S.W.2d 310, 312 (Tex. 1962); Restatement
(Second) of Property: Landlord & Tenant § 17.5 (1977). Comment c to Restatement
§ 17.5 explains: 

 The landlord's duty under the rule stated in this section is not merely
contractual, although it is founded upon a contract. It is a tort duty. It extends
to persons on the leased property with the consent of the tenant, with whom the
landlord has made no contract. 


Id., cmt. c. This "tort duty arises from the lessor's ability to make repairs and his control
over them[.]" Harvey, 362 S.W.2d at 312; see also Restatement (Second) of Torts § 357
(1965). 

 Section 9 of the lease agreements between the plaintiffs and BHA states: 

 9. DEFECTS HAZARDOUS TO LIFE, HEALTH AND SAFETY

 When conditions are created which are hazardous to life, health,
safety, and welfare of the occupants, Resident shall immediately
notify Management of the damage. Management shall be
responsible for the repair of the unit within a reasonable amount
of time. . . .


 If repairs of the defects cannot be made within a reasonable
amount of time, Management shall provide standard alternative
accommodations, if available. . . .


The provision gives rise to a tort duty to repair a condition hazardous to life, health, safety,
and welfare of the occupants within a reasonable amount of time after BHA learns of the
condition. The contractual requirement that the resident "immediately notify" management
applies to the contractual obligation to repair or provide "standard alternative
accommodations." The law does not require the resident to notify the obligated lessor, about
a hazardous condition the lessor already knows about, before the tort duty will arise,
however; the lessor who has agreed to repair a hazardous condition has a tort duty to exercise
reasonable care to complete a repair of a known hazardous condition in a reasonable amount
of time. This duty is different from the duty to disclose concealed dangers. We do not think
the duty to complete a repair is satisfied by a disclosure of the hazard, because the duty arises
as a result of the specific agreement to repair. See generally Khan, 138 S.W.3d at 297
(noting several duties a landlord owes with respect to premises turned over to tenants). In
this case, the evidence raises a fact issue regarding whether BHA learned of a hazardous
condition at the complexes in question before the alleged injuries occurred, and whether
BHA exercised reasonable care to complete the repairs in a reasonable amount of time
thereafter. 

 Relying on Davies, BHA argues that under section 392.006 of the Texas Local
Government Code, BHA is protected from liability based on any failure to comply with the
lease agreement. See Davies, 158 S.W.3d at 60. Section 392.006 provides the following:

 For all purposes, including the application of the Texas Tort Claims Act . . 
. , a housing authority is a unit of government and the functions of a housing
authority are essential governmental functions and not proprietary functions. 
Provided, however, a housing authority shall be subject to all landlord
obligations and tenant remedies, other than a suit for personal injuries, as set
forth in any lease or rental agreement and in Chapters 24, 54, 91, 92, and 301
of the Property Code.


Tex. Loc. Gov't Code Ann. § 392.006 (Vernon Supp. 2008). Essentially, the section
provides that in a suit against a housing authority other than for personal injuries, the housing
authority, despite its status as a governmental unit, is subject to the obligations and tenant
remedies under the lease agreement and in Property Code Chapters 24, 54, 91, 92, and 301. 
See id. In other words, the fact that the housing authority is a unit of government exercising
governmental functions does not protect the housing authority from those obligations,
designated in Section 392.006, it has as a landlord. Section 392.006 makes clear, however,
that in a suit against a housing authority for personal injuries, the provisions of the Texas
Tort Claims Act control the housing authority's liability. The Texas Tort Claims Act waives
immunity to suit for personal injuries caused by a condition of real property "if the
governmental unit would, were it a private person, be liable to the claimant according to
Texas law." See Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2). 

 The cause of action here is not for contract damages or specific performance. 
Plaintiffs do not seek a contractual remedy governed by the lease or the Property Code, but
a tort remedy provided a tenant under circumstances where the landlord has agreed to make
repair, fails to exercise reasonable care to complete the repair, and damages result. Compare
Davies, 158 S.W.3d at 60 ("Because Davies's suit is for personal injuries, we conclude that
the legislature has not waived BHA's immunity from suit for any obligations BHA may have
had under the lease agreement."). 

 BHA also relies on section 92.052 of the Property Code, and argues that its duty to
repair is statutorily limited to making a diligent effort to repair a condition only after
receiving written notice. See Tex. Prop. Code Ann. § 92.052 (Vernon Supp. 2008). The
testimony of the adult plaintiffs indicates they did not provide written notice of peeling lead
paint in their apartments before the injuries. However, section 92.052 does not apply to
personal injury claims. See Timberwalk Apts. v. Cain, 972 S.W.2d 749, 755 (Tex. 1998);
Moreno v. Brittany Square Assocs., L.P., 899 S.W.2d 261, 263 (Tex. App.--Houston [14th
Dist.] 1995, writ denied).

 BHA also contends that plaintiffs have no claims the warnings were inadequate 
because the Act does not waive immunity for a failure to act. BHA cites Lamar University,
971 S.W.2d at 196 and City of Fort Worth v. Crockett, 142 S.W.3d 550, 554 (Tex. App.--Fort
Worth 2004, pet. denied). Crockett involved the recreational use statute and the limited duty
owed to trespassers; this case does not involve the recreational use statute or the duty owed
under that statute. See Crockett, 142 S.W.3d at 553-54. In Lamar, this Court held that
"[f]ailure to use, failure to act, or non-use claims do not satisfy the use-of-property
requirement" of section 101.021(2). Lamar, 971 S.W.2d at 196. Here, plaintiffs are tenants,
and claim the lead-based paint existing at the complexes constituted a "dangerous condition
. . . that rendered the premises unsafe[.]" This is not a case concerning the non-use
distinction for the "use" of property requirement at issue in Lamar, but instead involves a
premises condition. (2) 

 BHA correctly asserts that plaintiffs have no viable claim for breach of the warranty
of habitability, and the TTCA does not waive immunity to suit based on that claim. That is
true because under Texas case-law a tenant has no personal injury claim against the lessor
for breach of an implied warranty of habitability. See Porter v. Lumbermen's Inv. Corp., 606
S.W.2d 715, 717 (Tex. Civ. App.--Austin 1980, no writ); Craig v. Mixon, No. 07-97-0350-CV, 1998 Tex. App. LEXIS 4888, at *13-14 (Tex. App.--Amarillo Aug. 11, 1998, pet.
denied) (not designated for publication). Immunity to suit has not been waived for a claim
for which a private lessor would not be liable as a matter of Texas law. See Tex. Civ. Prac.
& Rem. Code Ann. §§ 101.021(2); 101.025(a). 

 Issue two is overruled in part and sustained in part. 

Proximate Cause


 In its third issue, BHA argues the trial court erred in denying BHA's plea to the
jurisdiction because the jurisdictional evidence was legally insufficient to show any injury
proximately caused by exposure to lead-based paint at BHA-owned premises. Plaintiffs
provided the trial court with an affidavit of Wayne R. Snodgrass, M.D., Ph.D. The affidavit
concludes that, "to a reasonable degree of medical probability," the minor plaintiffs

 1. were exposed to lead (Pb) resulting in elevated whole blood lead
(Pb) levels;

 2. most likely got their lead (Pb) exposure and absorbed dose of
lead (Pb) from hand-to-mouth activity; and

 3. may have had their lead (Pb) exposure from paint chips
containing lead (Pb).


The affidavit further states the following are adverse effects of lead exposure in children:


 1. an average decrease in I.Q. of about 5 points in children with an
average whole blood lead (Pb) level of approximately 30 ug/dl
when compared to other children with an average whole blood
lead (Pb) level of approximately 10 ug/dl;

 2. a decrease in fine motor (muscle use) control in children with an
average whole blood lead (Pb) level of approximately 30 ug/dl
when compared to other young children with an average whole
blood lead (Pb) level of approximately 10 ug/dl;

 3. a trend toward prolongation of the nerve conduction time in
cranial nerve VIII (auditory, i.e., hearing) in children with whole
blood lead (Pb) levels in the range of approximately 25 to 30
ug/dl or more;

 4. inhibition of a biochemical blood test, red blood cell ALAD
(aminolevulinic acid dehydratase) activity, in children at whole
blood lead (Pb) levels of approximately 15 to 20 ug/dl; [and]

 5. an increased likelihood in children with elevated whole blood
lead (Pb) levels of behavioral disorders and decreased school
academic performance.


 In addition, it is well known that at higher whole blood lead (Pb) levels,
i.e., greater than 70 to 100 ug/dl, there is risk for encephalopathy, i.e.,
seizures and grossly obvious brain damage with subsequent mental
retardation/spasticity.


 We do not reach the merits of the claims in this appeal. Plaintiff's pleadings assert
BHA's fault caused injuries to the minor plaintiffs. Generally, unless the undisputed
jurisdictional evidence establishes otherwise, we are to accept the plaintiffs' allegations as
true in determining jurisdiction. See Bland, 34 S.W.3d at 554. Plaintiffs are not required "to
put on their case simply to establish jurisdiction." Id. Furthermore, when material evidence
concerning causation is disputed, the issue is one for the fact finder to resolve. See Ambrosio
v. Carter's Shooting Ctr., Inc., 20 S.W.3d 262, 266 (Tex. App.--Houston [14th Dist.] 2000,
pet. denied); see also Miranda, 133 S.W.3d at 227-28 ("If the evidence creates a fact
question regarding the jurisdictional issue, then the trial court cannot grant the plea to the
jurisdiction, and the fact issue will be resolved by the fact finder."). Considering plaintiffs'
pleadings of causation and damages, and the disputed jurisdictional facts before the trial
court, the trial court did not err in denying the plea to the jurisdiction. 

 Issue three is overruled. 

 The trial court's order denying the plea is affirmed. 

 AFFIRMED.


 _________________________________

 DAVID GAULTNEY

 Justice


Submitted on June 26, 2008

Opinion Delivered October 30, 2008 


Before McKeithen, C.J., Gaultney and Horton, JJ.
1. 1960 Cottonwood (Concord Homes) and 3720 Magnolia Street (Magnolia Gardens)
in Beaumont, Texas
2. We do not address the merits of the inadequate warning claim. As we have noted,
Texas law recognizes that a landlord has a duty to disclose concealed dangers. See Shell Oil
Co. v. Khan, 138 S.W.3d 288, 297 (Tex. 2004). The trial court has jurisdiction to dispose
of that claim on the merits. See Tex. Civ. Prac. & Rem. Code § 101.021(2).