

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00115-CV

_____

MT. PLEASANT INDEPENDENT SCHOOL DISTRICT, Appellant

V.

DONA K. ELLIOTT, Appellee

On Appeal from the 276th District Court
Titus County, Texas
Trial Court No. 36,910

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss
Concurring Opinion by Justice Carter

## MEMORANDUM OPINION

It was the third day of the new school year when the brakes failed on the bus driven by Dona K. Elliott, and Elliott's kneecap was broken in the ensuing crash.[1] The bus was a seventeen-year-old Thomas flat-nose school bus owned by Mount Pleasant Independent School District, transporting District students, and driven by Elliott for her employer, Durham Transportation, Inc. Durham had recently contracted with the District to operate and maintain the District's bus fleet and had recently taken over from the District Elliott's employment as a bus driver. The question posed here is whether the District's sovereign immunity has been waived for Elliott's personal injury lawsuit against the District and, thus, whether the courts have jurisdiction over the action. The trial court overruled the District's plea to the jurisdiction.[2]

Because (1) the District did not operate, use, or control the bus at the time of the accident, and (2) maintenance is not a "use" or "operation" of the bus, we reverse the judgment of the trial court and render judgment dismissing Elliott's claims against the District.

*(1)*    *The District Did Not Operate, Use, or Control the Bus at the Time of the Accident*

Elliott claims the District, a governmental unit of the State of Texas, was negligent in failing to adequately repair and maintain the brakes on the bus. The appeal turns on whether Elliott established at least a fact issue about a waiver of sovereign immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021(1), 101.051 (West 2011).

---

[1]It is undisputed that Elliott had no part in causing this crash. The accident report confirms that the crash was caused by brake failure.

[2]The District perfected this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West Supp. 2013).

Months before the accident, the District determined to hire an outside company to handle all aspects of its school bus fleet, including student transportation and fleet maintenance.[3]  To that end, the District contracted with Durham June 18, 2012.[4]  The agreement provided that Durham would inspect all buses to "ensure compliance with all applicable State and . . . Federal statutes, ordinances, and regulations . . . [so the buses] will meet or exceed the Texas Minimum Safety Standards for School Buses."  The agreement became effective July 5, 2012.  It is undisputed that Elliott was an employee of Durham on August 29, 2012—the date of the accident.[5]

Before Durham took over fleet maintenance and operations, the District had received numerous complaints related to the brakes on bus number fourteen—the bus involved in the accident.[6]  A different District-owned, Thomas flat-nose bus had similar brake problems.  When

---

[3]In previous years, student transportation and bus fleet maintenance were handled directly by the District.

[4]Although the District typically performed fleet maintenance during the summer, it did not perform any such maintenance before Durham's operational takeover in July 2012.  After the takeover, district mechanics remained under contract with the District for a thirty-day evaluation period by Durham.  At the conclusion of this evaluation period, Durham elected to hire new mechanics.

[5]Elliott applied for and received worker's compensation benefits through Durham for her injuries.  Elliott has been paid a total of $37,011.74 in worker's compensation benefits.

[6]The brake complaints were contained in the maintenance file for bus number fourteen.  Those complaints contain these salient notes:

- September 2008:  "Sometimes brakes will not hold on."  The mechanic is noted to have adjusted the brakes.
- November 2008:  The brakes were noted to be "slack" and were adjusted.
- December 2008:  The driver noted that "the brakes have a tendency to not hold when on incline."  The mechanic is noted to have adjusted the brakes.
- February 2009:  The driver noted that the brakes sometimes fail.  The mechanic is noted to have adjusted the brakes.
- April 2009:  The brakes were reported as "hard to stop sometimes." The mechanic noted that he repaired "R. Brakes & Drums."

the replacement brake shoes for that other bus did not fit, District employees cut off a piece of the new brake shoe with a blow torch to force a fit. There is no evidence of similar alterations to bus number fourteen. However, because bus number fourteen was seventeen years old, brake shoes to fit it were no longer sold.[7] The District contends that any pre-contract brake maintenance or repairs on bus number fourteen cannot operate as a waiver of its sovereign immunity.

Sovereign immunity deprives a trial court of subject-matter jurisdiction for lawsuits in which the State or certain governmental units have been sued unless the State consents to suit. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). In reviewing a trial court's ruling on a plea to the jurisdiction, we first look to the pleadings to determine if jurisdiction is proper. *City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009). We construe the pleadings in favor of the nonmovant. *Miranda*, 133 S.W.3d 217 at 226; *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Whether a trial court has subject-matter

---

- June 2009: The emergency brake was reported as "weak." The mechanic is noted to have adjusted the brakes.
- March 2010: The driver noted that the "rear brakes seem to be going out. They are not holding as I think they should." The mechanic noted that he "replaced brake shoes 4311E drums NW671018 – replaced R seal is leaking from right rear seal a little."
- August 2010: The hard brakes were slack and the parking brake was not holding. The mechanic's notes indicate that the "bus has new brake shoes and drums. I adjusted brakes."
- March 2011: The bus driver noted that the parking brakes "sometimes do not hold" and the hand brake is "slack." The mechanic noted that he replaced the rear brakes in response to this complaint.
- November 2011: The service brakes and hand brakes were reportedly slack. Mechanic notes indicate that brakes were adjusted. In March 2012, the service brakes and hand brakes were reported as slack. The mechanic is noted to have adjusted the brakes.

[7]A District representative testified that, after Durham's takeover, the District made its maintenance records for the fleet available for Durham's review and inspection one day before school started. Contrarily, the general manager for Durham testified that, when he requested maintenance records on the bus fleet, he was directed to a hodge-podge of boxes containing pre- and post-trip inspections, but was not given maintenance records.

jurisdiction is a question of law which is subject to de novo review. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998).

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence on that issue. *Kirwan*, 298 S.W.3d at 622. In reviewing the plea to the jurisdiction where evidence is submitted that implicates the merits of the case, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 227–28. This standard generally mirrors our summary judgment standard under Rule 166a(c) of the Texas Rules of Civil Procedure, and the burden is on the governmental unit as movant to meet the standard of proof. *Id.* at 228. After the governmental unit asserts and provides evidentiary support for its plea, the nonmovant is required to show only that a disputed material fact issue exists regarding the jurisdictional issue. *Id.*; *City of Dallas v. Heard*, 252 S.W.3d 98, 102 (Tex. App.—Dallas 2008, pet. denied). If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the plea to the jurisdiction is determined as a matter of law. *Miranda*, 133 S.W.3d at 228; *Heard*, 252 S.W.3d at 103.

The Texas Tort Claims Act (TTCA) provides a limited waiver of immunity from suit in certain narrowly-defined circumstances. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). The District, as a governmental unit, is

5

therefore immune from suit for Elliott's injuries unless immunity has been waived by the TTCA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2011).

The TTCA provides in relevant part,

A governmental unit in the state is liable for:

(1)    property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A)    the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B)    the employee would be personally liable to the claimant according to Texas law . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A), (B). Section 101.051 of the TTCA limits a school district's potential liability to claims involving motor vehicles. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.051 ("Except as to motor vehicles, this chapter does not apply to a school district."). Accordingly, the waiver of the District's immunity under the TTCA is limited to claims arising from the operation or use of a motor-driven vehicle.

The District contends, in reliance on *LeLeaux v. Hamshire-Fannett School District*, 835 S.W.2d 49 (Tex. 1992), that immunity was not waived because the District did not operate or use the bus at the time of the accident. *LeLeaux* involved a high school band student who was injured when she attempted to enter a parked school bus by the rear emergency door. The student claimed the district was negligent in its operation and use of the school bus due to its regular practice of loading and unloading band students through the emergency doors. The Texas Supreme Court recognized that "a school district is not liable for a personal injury

6

proximately caused by a negligent employee unless the injury 'arises from the operation or use of a motor-driven vehicle . . . .'" *Id*. at 51 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.021). Because the bus driver was not present when the injury occurred and the bus was parked and empty with the motor off, the high court concluded that the bus "was nothing more than the place where [the student] happened to injure herself." *Id*. Thus, sovereign immunity was not waived.

> While the statute does not specify whose operation or use is necessary—the employee's, the person who suffers injury, or some third party—we think the more plausible reading is that the required operation or use is that of the employee. This requirement is consistent with the clear intent of the Act that the waiver of sovereign immunity be limited.

*Id*.

Based on *LeLeaux's* statement indicating that the operation or use of the school bus must be that of a District employee, the District claims lack of jurisdiction because the accident was not caused by a District employee's operation or use of the bus. Here, Elliott was driving the bus in the course and scope of her employment with Durham—not the District—at the time of the accident. Although the District owned the bus, at the time of the accident, the bus was being operated by Elliott pursuant to her employer's agreement with the District.[8] The District thus contends that it has not waived immunity. *See also DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995) ("Consistent with subsection 1, we construe subsection 2 of section 101.021 to predicate the governmental unit's respondeat superior liability on the liability of its employee."); *Univ. of Tex. Health Sci. Ctr. v. Schroeder*, 190 S.W.3d 102, 106 (Tex. App.—Houston [1st

---

[8]Mere ownership of a motor-driven vehicle is not sufficient to establish use or operation under the TTCA. *See generally City of Balch Springs v. Austin*, 315 S.W.3d 219, 227 (Tex. App.—Dallas 2010, no pet.).

Dist.] 2005, no pet.) ("Although the term 'paid employee' is not contained within subsection two, the Supreme Court of Texas has interpreted subsection two of section 101.021 to require that a governmental employee use the tangible personal property.") (citing *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004)).

Elliott maintains that, even though she was the driver of the school bus at the time of the accident, that fact is not dispositive of the waiver issue. Like the District, Elliott relies on *LeLeaux* in support of her proposition. There, the court explained that the statutory language requiring that personal injury must arise from the operation or use of a motor-driven vehicle requires "a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle or piece of equipment." *LeLeaux*, 835 S.W.2d at 51. Elliott contends this language does not impose a requirement that the bus must be driven by a District employee. The issue, Elliott contends, is not who was driving the bus, but who exercised control over the bus.

"*LeLeaux* did not hold that the vehicle in question had to be driven by a governmental employee, only that a governmental employee 'use' or 'operate' the vehicle." *City of El Campo v. Rubio*, 980 S.W.2d 943, 946 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.). Elliott relies on *Rubio* to support her claim of District control over bus number fourteen on the accident date. In *Rubio*, a police officer had stopped a driver who was swerving between lanes. *Id*. at 944. The officer arrested the driver and ordered his wife, who was unlicensed, to drive the van. *Id*. The wife claimed that she acted under the officer's direct orders by driving the van and that

8

she was fearful for her family's safety on the highway late at night. *Id*. When the wife pulled onto the highway, her van was hit by an oncoming vehicle. *Id*.

The *Rubio* court found governmental immunity was waived because the officer "used or operated" the van by exercising control over the vehicle in directing the wife. *Id*. at 947. The court emphasized that the wife had "little or no choice and no control over the situation: she could have driven the vehicle, she could have had her twelve-year-old daughter drive the vehicle, or she could have sat on the side of Highway 59 at midnight with two children until help arrived from Houston." *Id*. at 946. We believe that *Rubio* is explained by the officer's exercise of direct control over the driver at the time of the accident.

Elliott also relies on *County of Galveston v. Morgan*, 882 S.W.2d 485 (Tex. App.—Houston [14th Dist.] 1994, writ denied), for the proposition that immunity is waived when the state operates or uses a vehicle by means of a state employee's exercise of control over the (third party) vehicle. There, county employees supervised road repair work and provided "spotters" to signal trucking company drivers when to move forward and when to stop. *Id*. at 487–88. A trucking company employee was injured by an electric shock after a spotter directed his truck too close to a power line. *Id*. at 490–91. In concluding that the spotters "used or operated" the truck to waive immunity under the TTCA, the court emphasized the spotters' sole discretion over the trucks' operations and the fact that a driver could be fired for moving his truck contrary to the spotters' directions. *Id*. at 490. *Morgan*, too, is explained by the state employee's exercise of direct control over the driver.

9

Here, Elliott contends the District operated or used the bus by means of its control over the bus. In support of this claim, Elliott relies on the following assertions: (1) the District owned the bus at the time of the crash, (2) the District ultimately had a nondelegable responsibility for the bus's safety and maintenance, (3) District mechanics continued responsibility for maintenance on the buses through August 1, 2012, (4) the District had a duty, and failed, to perform summer maintenance on the fleet before Durham took over, (5) the District "was aware of and responsible for the blatant defect in the brakes that caused the crash," (6) the District retained control over which buses to keep in the fleet, (7) the District owned ten 2010 International buses before the accident, but "saved" those buses for out-of-town trips and did not put them on the route, and (8) the District "effectively blindfolded Durham, deliberately withholding the maintenance records for bus No. 14 and only offering them for review and inspection one day before school started."

*Morgan* and *Rubio* do not support a waiver of immunity in this case because there is no evidence that District employees exercised direct control over the bus in question at the time of the accident. *See Townsend v. City of Alvin*, No. 14-05-00915-CV, 2006 WL 2345922, at \*3 (Tex. App.—Houston [14th Dist.] Aug. 15, 2006, no pet.) (mem. op.). In *Townsend*, the deceased motorist's husband sued the city after his wife was killed in a car accident with an unlicensed driver. Only minutes before the accident, a City of Alvin police officer stopped the young driver and discovered that he was unlicensed and untrained, had no insurance for the vehicle, and could provide no form of identification. In spite of this knowledge, the officer told the unlicensed driver to drive straight home. The fatal accident happened when the unlicensed

10

driver ran a red light, crashing into Townsend's car. *Id*. at *1. The Houston court distinguished

*Townsend* from *Morgan* and *Rubio*, finding:

> The county employees in *Morgan* retained sole discretion over each truck's movements, and the drivers had to follow their direction or risk being fired. *Morgan*, 882 S.W.2d at 490. Here, Officer Elliott retained no control over Leroux's vehicle, and Leroux would suffer no consequence for disobeying Officer Elliott. *Rubio's* unique facts also set it apart from this case. In *Rubio*, Pascuala was told to follow the officer to the police station after being given a brief lesson on how to drive a car. *Rubio*, 980 S.W.2d at 944. Here, Leroux was not ordered to follow Officer Elliott, and was not under his control.

*Id*. at *3.

The control theory of "use or operation" of a motor vehicle appears to require direct control of the actions of the actual operator of the motor vehicle. Short of that, "use or operation" under this theory must fail. For example, in *Sepulveda v. County of El Paso*, 170 S.W.3d 605, 614 (Tex. App.—El Paso 2005, pet. denied), a concrete company employee called the sheriff's department to report illegal drag racing on the road leading up to his plant. *Id*. at 608. To contain the drag racers, a sheriff's deputy asked a company employee to construct a temporary sand berm no higher than two feet using one of the company's front-end loaders. *Id*. at 609. No one from the sheriff's department was present when the berm was constructed, and the berm was built between three and five feet tall. *Id*. The following afternoon, Sepulveda's vehicle collided with the berm. *Id*. The El Paso Court of Appeals held immunity was not waived because the deputy was not present for and retained no control over the berm's construction; therefore, he did not "use" or "operate" the vehicle that constructed the berm. *Id*. at 614.

11

The District further maintains that *Morgan* and *Rubio* do not apply in any event, because those cases do not focus on control in contravention of an agreement. The District contends that, to establish that it controlled the fleet in contravention of its agreement with Durham, Elliott must produce evidence demonstrating that the "true operating agreement vested the right of control in" the District—and not Durham—despite the contractual terms. *City of Paris v. Floyd*, 150 S.W.3d 224, 227 (Tex. App.—Texarkana 2004, no pet.).

In *Floyd*, a homeowner claimed a municipality failed to properly operate, use, and maintain its sewer system, including motor-driven pumps in the lift station, after his property was flooded with raw sewage. An independent contractor was sued as well for negligently failing to close its excavation and to install certain components in the system. *Id*. at 225. Included in its plea to the jurisdiction was the City's contention that, because Brown was an independent contractor as set out by a written contract, the City had no right to control Brown's activities. "When a contract establishes an independent contractor relationship, evidence outside the contract may be produced to show that, despite the contract terms, the true operating agreement vested the right of control in the principal." *Id*. at 227 (citing *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 592 (Tex. 1964)). Further, "[s]poradic action directing the details of the work will not destroy the agent's independence provided by the contract." *Id*. The assumption of the exercise of control must be "so persistent and the acquiescence therein so pronounced" as to raise an inference that, when the incident occurred, the parties by implied consent had agreed that the principal had the right to control the details of the work. *Id*. (quoting *Farrell v. Greater Houston Transp. Co.*, 908 S.W.2d 1, 3 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

12

Taking each of Elliott's contentions as true and indulging every reasonable inference in Elliott's favor, we conclude that there is no fact question on the issue of control. *See Miranda*, 133 S.W.3d at 227–28. The District did not direct or command Elliott or Durham to do any specific act. It merely turned its fleet of buses over to Durham on July 5, 2012. It is of no consequence to our decision here whether the District failed to see that the brakes on bus number fourteen were safe and in good working order when it turned the fleet over to Durham or at any later time. This is not the type of direct control exhibited in *Morgan* and *Rubio* and does not evidence an assumption of the exercise of control under the District's contract with Durham.

To the contrary, the evidence shows that the District contracted with Durham to operate, use, and maintain the fleet. The factual basis for Elliott's claim of control concerned decisions (brake repair or lack of maintenance) that were made before Durham's contract became effective July 5, 2012—almost two months before the subject accident. The evidence shows Durham had complete control over the fleet as of July 5, 2012, by virtue of its contract with the District.[9] Durham started from the "ground up doing preventative maintenance evaluations on [the buses], and checking them out from top to bottom." This included checking the brakes on each bus.[10]

---

[9]The contract provides that Durham shall provide "(a) the daily service for the DISTRICT, and (b) such other transportation as may be specified by the DISTRICT." Durham was to provide a formal safety instruction program on a regular basis for all operating personnel. Routing and scheduling were to be established cooperatively by Durham and the District. Durham was to employ and assign drivers, keep all operational records and accident reports, perform all preventative maintenance on the buses, including cleaning and repairs, safety inspections, risk and safety management inspections, reporting inspections, accident and incident reporting and investigation, safety auditing, maintenance, pre- and post-trip inspections, wheel check inspections, fluid analysis, and mechanic training and certification, among other things.

[10]After the accident, Durham took bus number fourteen to Priefert in Mount Pleasant for an independent evaluation. The evaluation showed that, even though Durham had recently completed preventative maintenance on this bus, the brake system was already out of tolerance.

13

A Durham representative testified that Durham made the decision to pare down the bus fleet from eighty to sixty buses. Durham determined which buses to keep and which to discard. Additionally, Durham decided to keep the newer buses for out-of-town trips rather than adding them to the daily routes. And, after the accident, Durham made the decision to pull all of the Thomas buses out of service and replace them with other buses. Elliott has failed to show that the "true operating agreement vested the right of control in" the District—not Durham—despite the contractual terms. *Floyd*, 150 S.W.3d at 227.[11]

Because Elliott failed to raise a disputed fact question on whether the District controlled the operation and use of the bus on the accident date or whether Durham's assumption of control under the District's contract with Durham was a sham, there is no waiver of the District's immunity under these theories.

*(2)     Maintenance Is Not a "Use" or "Operation" of the Bus*

Before July 5, 2012, the District was solely responsible for the maintenance of its bus fleet. Here, Elliott points to the pre-contract maintenance work performed on bus number fourteen, claiming that the District's allegedly negligent brake work and/or maintenance amounts to an operation or use of the bus under the TTCA.

As the TTCA does not define the terms "operation" and "use," they have been construed in accordance with their ordinary meaning. TEX. GOV'T CODE ANN. § 311.011 (West 2013); *Naranjo v. Sw. Indep. Sch. Dist.*, 777 S.W.2d 190, 192 (Tex. App.—San Antonio 1989, writ

---

[11]Typically, whether a written contract establishes an independent contractor relationship is a question of law for the court, while the question of actual control is a question of fact for the jury. *Shell Oil Co. v. Khan*, 138 S.W.3d 288 (Tex. 2004).

denied). The Texas Supreme Court has defined the word "use" as "to put or bring into action or service; to employ for or apply to a given purpose" and has defined "operation" as "a doing or performing of a practical work." *LeLeaux*, 835 S.W.2d at 51; *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989). The terms "operation or use of a motor-driven vehicle" means "the transportation of a person from one place to another, and such transportation necessarily includes the act of stopping the vehicle when one has reached one's destination." *Naranjo*, 777 S.W.2d at 192.[12] In *LeLeaux*, the court noted that the bus on which a student bumped her head

> was not in operation; it was parked, empty, with the motor off. The driver was not aboard; there were no students aboard. The bus was not "doing or performing a practical work"; it was not being "put or [brought] into action or service"; it was not being "employe[ed] or appl[ied] to a given purpose." The bus was nothing more than the place where Monica happened to injure herself.

*LeLeaux*, 835 S.W.2d at 51. An empty, parked bus with its motor off is not in "operation" or "use" under the statute. That also tends to describe a vehicle under maintenance: parked, empty, and not running. We do not believe that maintenance somehow falls within this definition of "operation" and "use" of a motor-driven vehicle.

Elliott contends, though, that our opinion in *City of Paris v. Floyd*, 150 S.W.3d 224 (Tex. App.—Texarkana 2004, no pet.), lends support to her contention that maintenance falls within the scope of the terms "operation" and "use" of a motor-driven vehicle. That case involved the City's potential waiver of immunity under Section 101.021(1) of the TTCA (affecting a waiver

---

[12]This explanation of "operation or use" was given in the context of a case in which a police officer left his car unattended with the motor running outside a jail when an inmate used the car to escape. *Finnigan v. Blanco Cnty.*, 670 S.W.2d 313, 316 (Tex. App.—Austin 1984, no writ). *Finnigan* pre-date's the court's definition of these terms.

15

of immunity for property damage that arises from the operation or use of motor-driven equipment). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1). The issue was whether the plaintiffs adequately alleged an "operation or use" of motor-driven equipment. This Court initially noted that the City's sewer lift station, which was operated by motor-driven pumps, fell within the generic definition of the Code. *Floyd*, 150 S.W.3d at 228. Floyd alleged the operation or use of motor-driven equipment by asserting the City and its "agent(s)" were negligent:

> In failing to properly operate, use, maintain, or install the electric pumps within the Lift Station such that they could control the water entering the system through Brown Construction's open excavation. . . . ;

> In failing to operate, use, maintain, or install sufficient equipment within the Lift Station to handle water such as that which entered into the system on the occasion in question; and

> In operating and/or using said Lift Station and its electric motors to transport storm runoff water, for which use they were not designed.

The intervenors alleged the operation or use of motor-driven equipment by asserting the City and its "agent(s)" were negligent:

> In failing to properly maintain the electric pumps within the Lift Station such that they could control the water entering the system through Brown Construction's open excavation. . . . ;

> In operating the electric pumps at the Lift Station and sewer lines to pump rain water overflow when the pumps and lines were only designed for sewage;

> In failing to operate the electrical pumps effectively at a time when the line was exposed to rainwater overflow; and

> In operating an electrical [sic] pump that was of insufficient size and capacity to handle rainwater overflow and in failing to operate, use, install or maintain

16

sufficient motorized equipment within the Lift Station to handle water such as that which entered the premises in question.

*Id*. at 228–29. This Court concluded that the pleadings were "sufficient to raise an issue of whether the City was negligent in its operation or use of motor-driven equipment." *Id*. at 229. Elliott characterizes this Court's conclusion regarding sufficiency of the pleadings in *Floyd* as holding that "a plaintiff's allegation of negligence in failing to 'maintain' sufficiently raised issues under 'operation or use' to avoid dismissal under the City's plea to the jurisdiction." While the *Floyd* petition included allegations that the City failed to properly maintain the property, such allegations did not stand alone. The petition included numerous other allegations on which we relied to determine the City's plea to the jurisdiction failed. In arriving at this conclusion, the court indicated that it was "reading the *pleadings* in the light most favorable to the nonmovants . . . ." *Id*. at 229. The court did not conclude that allegations of negligent maintenance were sufficient to avoid dismissal under the plea to the jurisdiction.[13] We reject the assertion that maintenance falls within the scope of the terms "operation" and "use" as used in Section 101.021(1)(A). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A).

Section 101.021(1)(A) speaks only of damage, injury, or death arising from the operation or use of a motor-driven vehicle or motor-driven equipment. *See id.* Because the term "maintenance" is not included in this section of the statute, the District contends this term cannot be "read" into the statute. This is especially true in light of the fact that the TTCA includes

---

[13]The District attempts to distinguish *Floyd* by focusing on the fact that the TTCA specifically lists "vehicle and motor-driven equipment maintenance" and "water and sewer service" as government functions for which a municipality may be held liable. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(24), (32) (West Supp. 2013). The sole mention of municipal liability in *Floyd*, based on this section of the statute, was set out in direct quote of the pleadings, in which it was alleged that the electric motors were "'motor driven equipment' as that term is defined by TEX. CIV. PRAC. & REM. ANN. § 101.021(1) and § 101.215(32)." *Floyd*, 150 S.W.3d at 229.

17

"vehicle and motor-driven equipment maintenance" as a governmental function for which a municipality's immunity may be waived. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(24) (liability of municipality).

Moreover, Section 22.0511 of the Texas Education Code provides immunity from liability for professional employees of Texas school districts for matters generally within the scope of the employee's duties involving the exercise of judgment or discretion. TEX. EDUC. CODE ANN. § 22.0511(a) (West 2012). This Section specifically provides, however, that it does not apply to the operation, use, or *maintenance* of any motor vehicle. TEX. EDUC. CODE ANN. § 22.0511(b) (West 2012) (emphasis added). The District contends that, because this limited waiver is similar to the waiver in the TTCA and the Texas Education Code specifically includes maintenance whereas the TTCA does not, the omission in the TTCA was intended.

"[B]ecause we presume that every word of a statute has been included or excluded for a reason, we will not insert requirements that are not provided by law." *Old Am. Cnty. Mut. Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 115 (Tex. 2004). Moreover, "the Legislature did not intend to do a useless thing by putting a meaningless provision in a statute." *Barr v. Bernhard*, 562 S.W.2d 844, 849 (Tex. 1978). Under this doctrine, the District submits that we must presume the Legislature specifically intended to include "maintenance" in Section 22.0511 of the Texas Education Code and specifically intended to exclude "maintenance" from the TTCA's immunity waiver provision in Section 101.021 of the Code. We agree.[14]

---

[14]The District also relies on *Naranjo* for the proposition that Texas courts have treated maintenance of a motor vehicle as separate and distinct from operation and use of such vehicle. In that case, a student was injured while he was working on the carburetor of an automobile in an auto mechanics class. *Naranjo*, 777 S.W.2d 190. In an attempt to prime the engine, Naranjo poured gasoline into the carburetor, and another student turned the ignition.

18

In the context of considering whether the driver of the school bus was immune from liability under Section 21.912(c) of the Texas Education Code, which grants qualified immunity to school employees for acts done within the scope of their employment involving judgment or discretion, the court noted that such immunity does not extend to acts incident to the operation, use or maintenance of motor vehicles. *Naranjo*, 777 S.W.2d at 193. The court reasoned that, because the language in Section 21.912(c) is similar to that used in the TTCA, it adopted its reasoning regarding "operation" or "use." *Id.* With respect to the issue of waiver due on the maintenance issue, the court observed, "The ordinary meaning of the term 'maintenance' in this context means the upkeep of a motor vehicle. In that regard the motor vehicle must be used to transport persons and the statute contemplates a 'running' or road-worthy vehicle." *Id.* The District thus contends that, because "maintenance" means "the upkeep of a motor vehicle," such term is separate and distinct from the terms "operation" and "use," as set forth in the statute.[15]

---

This resulted in an explosion which ignited the gasoline, injuring Naranjo. *Id.* at 191. The court framed the issue as one of whether the student was injured as a result of the negligent operation or use of the motor vehicle itself or as a result of the instructor's direction, control, and supervision of the students. Because Naranjo was not injured by the motor vehicle itself, immunity was not waived. *Id.* at 192.

[15]The District also includes a discussion of the term "use" of a vehicle as a separate concept from "maintenance" of a vehicle in the context of insurance policies. In this context, courts define "use" as "to put into action or service" or "employment of a vehicle as a means of transportation, or some other purpose incident to transportation." *Nationwide Prop. & Cas. Ins. Co. v. McFarland*, 887 S.W.2d 487, 493 (Tex. App.—Dallas 1994, writ denied) (holding that shifting vehicle into neutral while performing repair work was maintenance and not use). This Court, in the case of *Tucker v. Allstate Texas Lloyds Insurance Co.*, 180 S.W.3d 880 (Tex. App.—Texarkana 2005, no pet.), defined "use" in the context of an insurance coverage dispute in the same manner as *LeLeaux*: "to put . . . into action or service; to employ for a given purpose." *Id.* at 886 (citing *LeLeaux*, 835 S.W.2d at 51) (weighing airplane is neither use nor maintenance). "Maintenance" means "to preserve or keep in an existing state or condition and embraces the acts of repair and other acts to prevent a decline, lapse, or cessation from that state or condition." *McFarland*, 887 S.W.2d at 493. As such, maintenance (in the context of an insurance policy) involves action taken to keep or make a vehicle operable. *Tucker*, 180 S.W.3d at 886.

19

"Maintenance" has been defined as a concept distinct from "operation" or "use" outside of the TTCA. There is no salient reason why the definition of maintenance, as used in other contexts, should not be used within the context of this case. Elliott has not pointed this Court to any such reason and has relied solely on this Court's opinion in *Floyd* for the proposition that negligent maintenance constitutes an operation or use of the bus. That argument, as discussed earlier, is not persuasive.

In reality, this issue is resolved by *LeLeaux*, where it was determined that an empty, parked bus was not being used or operated and was merely the situs of the injury. Because a parked bus is not being operated or used and because a bus must be stationary to be maintained, the logical conclusion is that brake maintenance or repair does not fall within the definition of "operation" or "use."

Because the District's brake maintenance and/or repair cannot be considered an "operation" or "use" of the bus, the District has not waived its immunity under this theory.[16]

We reverse the judgment of the trial court and render judgment dismissing Elliott's claims against the District for want of jurisdiction.


Josh R. Morriss, III
Chief Justice

---

[16]The District contends that Elliott's allegations, if true, would at best be a use of personal property (improper maintenance, utilizing an incorrect brake shoe). However, under Section 101.021 of the TTCA, although a governmental entity may be liable for damages caused by a condition or use or personal property, this section is not applicable to the District. Claims against school districts are specifically limited to claims involving the operation or use of a motor vehicle. TEX. CIV. PRAC. & REM. CODE ANN. § 101.051.

CONCURRING OPINION

The Texas Tort Claims Act waives immunity for personal injury "proximately caused by the wrongful act or omission or the negligence of an employee acting within [her] scope of employment" when, among other things, the personal injury "arises from the operation or use of a motor-driven vehicle" and "the employee would be personally liable to the claimant according to Texas law . . . ." TEX. CIV. PRAC. & REM. CODE ANN. 101.021 (West 2011).

This bus had a long history of brake problems. An independent analysis conducted after the accident determined that the brake system was out of tolerance. The usual practice was for the District's mechanics to perform maintenance work on the buses during the summer. But, apparently since the District had contracted with Durham, no maintenance was performed in the summer of 2012. So, a bus with a history of faulty brakes was not maintained during the summer immediately prior to Durham assuming control of the bus system. In that respect, it could be argued that a proximate cause of this ultimate injury was the negligence of the District in failing to maintain an acceptable brake system for the bus and in delivering it over to the contractor in that negligently maintained condition.

The second part of the statutory requirement is that the personal injury arise from the operation or use of a motor-driven vehicle. Without question, this injury arose from the accident when the bus, owned by the District, was in operation, and the brakes malfunctioned.

I believe there is a reasonable argument, based on the TTCA, that, if the District was negligent in failing to maintain the bus and if that negligence was a proximate cause of an injury

21

which occurred while the bus was in operation, the District has waived its immunity.  Since this particular argument was not made in this case, it is not before us and, therefore, I concur in the result of the majority opinion.


                                        Jack Carter
                                        Justice


Date Submitted:        March 12, 2014
Date Decided:          April 17, 2014