In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00058-CV**
_____

**DOMINO'S PIZZA, L.L.C.**

**V.**

**RAGHURAMI B. REDDY, AS GUARDIAN OF THE PERSON AND ESTATE OF DEVAVARAM CHRISTOPHER AND OF THE ESTATE OF RUTH CHRISTOPHER**

**On Appeal from the 58th District Court**
**Jefferson County, Texas**
**Trial Cause No. A-192,970**

**MEMORANDUM OPINION**

In August 2012, a vehicle driven by Joshua Balka, a pizza delivery driver, hydroplaned due to a bald tire and wet pavement and struck the vehicle of Devavaram and Ruth Christopher, killing Ruth and injuring Devavaram. Balka was employed by MAC Pizza Management, Inc., a franchisee of Domino's Pizza, L.L.C. The police officer called to the scene cited Balka for failing to control his speed and for having an unsafe or defective tire. Raghurami B. Reddy, as Guardian

1

of the Person and Estate of Devavaram Christopher and of the Estate of Ruth Christopher, sued MAC and Domino's for negligence. Reddy settled with MAC before trial.

A jury found that (1) Balka was 10 percent negligent, MAC was 30 percent negligent, and Domino's was 60 percent negligent; (2) Domino's controlled or had the right to control the details of the injury-producing acts or omissions of MAC and its employees; (3) Domino's failed to exercise ordinary care in the control or right to control those details; (4) this failure to exercise ordinary care was the proximate cause of the occurrence in question; and (5) Balka was operating his vehicle in furtherance of a mission for the benefit of Domino's and subject to Domino's control. In seven appellate issues, Domino's challenges (1) the legal sufficiency of the evidence to support duty, breach, causation, and damages; (2) the effect of Reddy's settlement with MAC; (3) the trial court's failure to include certain instructions in the jury charge; (4) the propriety of Reddy's jury argument; and (5) the trial court's settlement credit. We reverse the trial court's judgment and render judgment dismissing Reddy's claims against Domino's.

## Legal Sufficiency

In issue one, Domino's contends that the evidence is legally insufficient to establish that it owed a duty to the Christophers because, according to Domino's, it

2

had no right to control MAC's day-to-day operations, did not exercise control over the injury-producing acts, and could not be held vicariously liable. Under legal sufficiency review, we consider whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the verdict, credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

"An independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his or her own means and methods without submitting to the control of the other person as to the details of the work." *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied). When determining whether a franchisor is vicariously liable for a franchisee's conduct, we consider whether the franchisor has the right to control the franchisee with respect to the details of that conduct. *See State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex. 1998). A party can prove the right to control by evidence of (1) a contractual agreement that explicitly assigns the franchisor a right to control; or (2) the franchisor's actual exercise of control. *Coastal Marine Serv. of Tex. v. Lawrence*,

988 S.W.2d 223, 226 (Tex. 1999). "To trigger vicarious liability, the right to control must extend to the specific activity from which the injury arose." *Farlow*, 284 S.W.3d at 911-12. Several factors aid the right of control determination: (1) the independent nature of the business; (2) the obligation to furnish tools, supplies, and materials; (3) the right to control work progress, except as to final results; (4) the time of employment; and (5) the method of payment. *Id*. at 911.

"A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties." *Id*. "Evidence that the parties did not intend for an independent contractor relationship can come from the contract itself, i.e., whether, despite language describing the relationship as an independent contractor relationship, other contract language evidences such a right of control that the relationship is actually that of employer/employee." *Id*. "It can also come from extrinsic evidence, such as instances of actual control by the principal sufficient to show that the true agreement of the parties vested a right of control establishing an employment relationship." *Id*.

4

According to the franchise agreement, the relationship between MAC and Domino's is that of independent contractor. The contract requires MAC to retain various business records and to submit sales reports and financial statements to Domino's "from time to time[.]" MAC agreed to participate in "all training programs and classes . . . require[d] for the operation of a Domino's Pizza Store[,]" as well as supplemental training, but MAC is responsible for costs incurred during the training. MAC must abide by all specifications, standards, operating procedures, and rules prescribed for the operation of a Domino's Pizza store. Thomas Moyes, MAC's vice-president of operations, testified that Domino's sends a certified letter when rules are not followed and instructs how to correct the problem or the franchise agreement could be cancelled.

The contract also gives Domino's "full access, either on-site or from a remote location, to all of [MAC's] computer data, equipment and systems containing any and all of the information, records and reports required[.]" For a fee, Domino's licenses its PULSE computer software to MAC for use in running the store's operating system. Under the Online Ordering Franchisee Agreement, online orders are placed at Dominos.com and forwarded to MAC through PULSE. According to Moyes and Christopher Childs, Balka's store manager, Domino's has full access to PULSE and can evaluate delivery times through PULSE.

The Domino's Manager's Reference Guide sets forth the "minimum guidelines for the operation of all Domino's Pizza stores, both company-owned stores and franchise-owned stores, in order to promote the Domino's Pizza brand and trademarks in a favorable manner." The Guide covers several topics, including driver requirements and conduct, use of cellular telephones during business hours, closing procedures, sanitation, delivery vehicles, minimum standard store hours, use of trademarks, uniform standards, employee grooming and appearance standards, use of approved heat-retaining containers, and pest control. Childs and Moyes testified that the Guide addresses every aspect of the store's operations, and Moyes testified that MAC only has the control that Domino's allows it to have.

Joseph Devereaux, director of franchise services for Domino's, explained that franchisors, like Domino's, have a set standard of business practices to ensure consistency among franchisees and to positively promote the brand. Devereaux admitted that Domino's makes, changes, and enforces the rules. However, he and Moyes agreed that the Guide provides the minimum requirements MAC must follow and that MAC has authority to strengthen those rules. Devereaux testified that the franchisee is in charge of the details for implementing these rules. Childs agreed that MAC implements Domino's minimum standards and has the authority to raise those standards if it chooses.

Specifically, the Guide requires that a delivery driver's vehicle be inspected at the point of hire and periodically thereafter, but did not detail how those inspections should be performed. Childs testified that MAC decides the details of how and when to conduct inspections. He testified that, instead of periodic inspections, MAC checked drivers' state inspection stickers. Childs testified that if Domino's had enforced the rule for periodic inspections, Balka's vehicle would have been inspected accordingly. Childs testified that Domino's could have inspected the drivers' vehicles, but never asked to do so. Moyes explained that Domino's did not conduct vehicle inspections and MAC did not provide Domino's with the results of MAC's inspections. After the accident, MAC changed the details of its vehicle inspections.

Additionally, the franchise agreement limits MAC's delivery area. Childs testified that pizzas are not delivered outside a nine-minute delivery area. Moyes testified that Domino's prefers delivery areas under nine minutes from the store so that pizzas can be delivered safely in less than thirty minutes from when an order is taken. Devereaux testified that the goal is to deliver pizzas within thirty minutes. Childs explained that, once an order is received, twenty-one minutes are allotted for preparation and nine minutes for delivery. Balka testified that, on the night of the accident, he was driving too fast under the circumstances so the pizza would be

delivered timely, but he was never told to drive unsafely and did not feel pressured to drive unsafely. Childs and Moyes testified that Balka was serving Domino's purposes when the accident occurred.

Pursuant to the franchise agreement, Domino's retained the right to require an audit and to conduct certain inspections at any time during business hours and without prior notice to MAC. According to Childs, Domino's management conducts an Operations Evaluation Report ("O.E.R.")[1] about every three months. He testified that a Domino's manager visits the store at least monthly, has full access to the store, and if the manager tells Childs to do something, Childs must comply. Moyes testified that a Domino's employee comes to the store every two to three months. Devereaux testified that Domino's employees are physically present in the store approximately three to four times per year. Childs admitted that no Domino's employees work in the store and that, unlike Domino's corporate employees, MAC corporate employees are present in the store about four to five times per week.

Childs testified that MAC employees are financially motivated to obtain a high-scoring review and that one item on the O.E.R. focuses on the speed of delivery. He testified that it hurts the drivers' pay performance if deliveries take

---

[1]Childs refers to the report as an "Operations Excellence Review" but the report itself is called an "Operations Evaluation Report."

8

longer than nine minutes. Moyes testified that the O.E.R. will score lower if delivery times are not what they should be, and a poor score can affect a manager's bonus or employment. Devereaux explained that O.E.R. information is gathered through PULSE and delivery times play a role in the O.E.R. Childs testified that Domino's encouraged competition to improve job performance, so Childs created a competition for drivers and posted results on who drove the fastest. Moyes admitted that Domino's never ratified this competition, nor was the payment of an incentive suggested or promoted by Domino's. Devereaux testified that Domino's does not promote pay incentives for drivers based on the speed of delivery.

Balka and Childs both testified that Domino's controls and has the right to control the store's daily activities.[2] Balka testified that he was required to follow Domino's rules and he wore Domino's branded clothing, delivered pizza in Domino's pizza boxes and heating containers, and had a Domino's sign for his vehicle. However, he admitted that his paycheck comes from MAC. Childs also testified that he receives a paycheck from MAC and is an employee of MAC. When potential employees complete an application on the Domino's website, Domino's forwards the applications to MAC to handle the details of hiring employees. Childs and Moyes testified that MAC handles the store's daily

---

[2]Balka testified that when he first began delivering pizzas, he believed he worked for Domino's and he knew nothing about MAC.

operations, owns the store's equipment, and controls the store's details and specifics, such as vehicle inspections, implementation of incentives, acceptance of pizza orders, standards for drivers, pizza prices, provision of uniforms, repairs, donations, marketing, and decisions regarding the hiring, firing, paying, supervising, scheduling, disciplining, and training of employees.

Childs and Moyes both testified that MAC receives training materials from Domino's, but Childs testified that MAC conducts its own Management Team Member Safety Awareness presentation, and Moyes testified that Domino's does not train MAC's employees. Balka testified that MAC employees conduct training at the store. In accordance with the franchise agreement, MAC is responsible for training its own employees, with the sole responsibility "for training the employees to legally, safely and properly perform his or her duties while inside the Store and while outside the Store for business purposes including training [its] employees to follow appropriate procedures for their safety and well-being."

Devereaux testified that franchisees, like MAC, pay a weekly royalty fee to Domino's, have the right to use Domino's trademarks and the uniform business format, and have the right to control day-to-day operations. Devereaux also testified that Domino's has no legal relationship with a franchisee's employees. The franchise agreement expressly provides that MAC acknowledges and

understands that it is not Domino's responsibility or duty to train employees or to operate the store and that Domino's does not have the legal right to direct MAC's employees in the operation of the store. Domino's agreed to provide "reasonable operating assistance[,]" but the agreement expressly states that such assistance is not an assumption of MAC's responsibilities or duties. The agreement states that the store would at all times be under MAC's supervision, that MAC is responsible for recruiting, hiring, training, scheduling, supervising, and paying its employees, and that these persons are employees of MAC, not Domino's.

On appeal, Reddy maintains that Domino's had both a contractual right of control and actual control. According to Reddy, "[c]opious evidence in the contract and the record indicates that the 'independent contractor' franchise agreement was a sham because Domino's had a contractual right to control every minutiae at MAC's . . . store including the injury-causing activity." Reddy points to the following evidence to support his contention: (1) MAC must comply with Domino's specifications, standards, and operating procedures, including the "methods and procedures relating to receiving, preparing, and delivering customer orders[;]" (2) Domino's can unilaterally modify its standards and procedures and can conduct inspections; (3) Domino's may terminate the franchise agreement if MAC fails to comply with corporate standards and procedures; (4) Domino's

11

standards regulate driver age and history, safety, vehicle inspections, and driver conduct during deliveries; (5) the corporate guidelines promote speeding among delivery drivers by use of the thirty-minute rule, PULSE time tracking, evaluations that factored delivered times into their scores and affected bonuses, and encouragement of incentives to improve job performance; and (6) Domino's decided the store's delivery area and provided directions and maps through PULSE.

The franchise agreement expressly provides that (1) MAC is an independent contractor; (2) the store's staff members are employed by MAC, not Domino's; (3) Domino's has no legal right to direct MAC's employees; (4) MAC is solely responsible for recruiting, hiring, training, scheduling, supervising, and paying its employees; (5) MAC is solely responsible for operating the store; and (6) Domino's does not assume MAC's responsibilities by providing "reasonable operating assistance." That Domino's retains the right to terminate the franchise agreement, retains a right to receive evaluations and other reports, has a right to conduct inspections, or requires MAC to comply with Domino's procedures and rules is not evidence that Domino's had the right of control. *See Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004) ("It has long been the rule that a right to receive reports is not a right to control."); *Dow Chem. Co. v. Bright*, 89 S.W.3d

12

602, 606-07 (Tex. 2002) (Rejecting argument that Dow had a right to control by virtue of requiring Bright to comply with Dow's rules and regulations.); *see also Johnston v. Oiltanking Houston, L.P.*, 367 S.W.3d 412, 419 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (A right to direct when to start, stop, or resume work does not impose liability.); *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (A right to inspect progress is insufficient to establish a right of control.); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 714, 720 (Tex. App.—Fort Worth 2006, no pet.) (The right to terminate an agreement and requirements for compliance with applicable practices, laws, and regulations that relate to performance of the agreement are not evidence of a right to control the details of the work.). Although Domino's has authority to modify its own rules and regulations, the right to prescribe alterations and deviations is not the type of supervisory control sufficient for imposing a duty on Domino's. *See Johnston*, 367 S.W.3d at 419. "A possibility of control is not evidence of a 'right to control' actually retained or exercised." *Lawrence*, 988 S.W.2d at 226.

Nor is the franchise agreement's independent contractor provision negated by the fact that Domino's has set general minimum operational standards for MAC to follow. *See Fitz v. Days Inns Worldwide, Inc.*, 147 S.W.3d 467, 473 (Tex.

13

App.—San Antonio 2004, pet. denied)(op. on reh'g). These rules and regulations gave MAC the right to control the means, methods, and details of operating the store and the record demonstrates that MAC is free to expound upon the Domino's store rules. While Domino's corporate conducts the O.E.R., MAC both pays earned bonuses and sets incentives. MAC owns the stores' equipment, trains its own employees, including drivers, has its own training director, is responsible for the store's daily operations, including the details of vehicle inspections, and, unlike Domino's corporate employees, MAC corporate employees visit the store several times per week. The franchise agreement merely sets forth the standards related to the work; the responsibility of implementing the details of those standards is left to MAC's discretion. Neither an occasional assertion of control or sporadic action directing the details of the work is sufficient to destroy the agreement forming the basis of the parties' independent contractor relationship. *See White v. DR & PA Deliverance, Ltd.*, No. 01-12-00227-CV, 2014 Tex. App. LEXIS 2091, at *6 (Tex. App.—Houston [1st Dist.] Feb. 25, 2014, no pet.) (mem. op.).

Nevertheless, Reddy maintains that Domino's may be liable for unreasonably increasing the risk of harm. "[A] contract requiring independent contractors to comply with general safety practices *and train their employees to do so* cannot constitute a right to control[.]" *Khan*, 138 S.W.3d at 293-94. Rather,

14

requiring an independent contractor's employees to "learn and follow general safety procedures subjects an owner only to a narrow duty to avoid increasing the risk of injury." *Id.* at 294. Reddy's petition did not assert that Domino's increased the risk of injury. *See Bright*, 89 S.W.3d at 609, 611 (noting that Bright never alleged that Dow's safety requirements and procedures unreasonably increased the probability and severity of injury to Bright). Nor did the jury charge contain a question as to this issue. *See Transit Mix Concrete & Materials Co. v. Johnson*, 205 S.W.3d 92, 96 (Tex. App.—Eastland 2006, pet. denied) (noting that the jury charge did not include an issue on whether Trinity's safety regulations unreasonably increased the probability and severity of injury). Moreover, Reddy pleaded that Domino's failed to (1) implement appropriate, sound, and safe rules and regulations; and (2) monitor, supervise, and enforce rules and regulations. Failing to implement a safety rule does not amount to actual control. *See Bright*, 89 S.W.3d at 609. As previously discussed, the means, methods, and details of implementing Domino's standards were left to MAC's discretion, MAC was responsible for training its own employees, including drivers, and Domino's did not approve incentives for faster deliveries. *See Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998) (The duty of care is commensurate with the control the party retains over the independent contractor's work, *i.e.*, when the

party provides detailed instructions on the means or methods of carrying out work.). MAC conducted no independent safety inspections of its own, but relied on its drivers to obtain state-required inspections, and did not inform Domino's of their reliance on state inspections, or the results of those inspections. The record does not indicate that Domino's knew MAC was not conducting periodic inspections. "To hold that the imposing of contractual safety requirements, alone, on independent contractors somehow subjects the employer either to a duty to prevent an independent contractor's negligent conduct or to liability for an independent contractor's negligence in failing to comply with safety requirements would deter general contractors from imposing even minimum safety rules and requirements." *Bell*, 205 S.W.3d at 721.

Based on the record before us, we conclude that the evidence is legally insufficient to support the jury's finding that Domino's controlled or had the right to control the details of the injury-producing acts or omissions of MAC and its employees. *See Smith*, 307 S.W.3d at 770; *see also Wilson*, 168 S.W.3d at 827. The record indicates that MAC was free to use its own means and methods as to the details of its work. *See Traver*, 980 S.W.2d at 627; *see also Farlow*, 284 S.W.3d at 911. We sustain issue one and need not address Domino's remaining

16

issues. *See* Tex. R. App. P. 47.1. We reverse the trial court's judgment and render judgment dismissing Reddy's claims against Domino's.

REVERSED AND RENDERED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on January 22, 2015
Opinion Delivered March 19, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.