# IN THE SUPREME COURT OF TEXAS

══════════

No. 20-0368

══════════

JLB BUILDERS, L.L.C., PETITIONER,

v.

JOSE HERNANDEZ, RESPONDENT

══════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
══════════════════════════════

**Argued February 23, 2021**

JUSTICE LEHRMANN delivered the opinion of the Court.

A general contractor owes a duty of care to its independent contractor's employees if the general contractor retains actual or contractual control over the means and methods of the independent contractor's work. The issue in this case is whether the general contractor on a construction project owed such a duty to a concrete subcontractor's employee who was injured on the job. The court of appeals held that a fact issue exists as to whether the general contractor exercised sufficient control to give rise to a duty of care, reversing the trial court's summary judgment in the contractor's favor. We agree with the trial court that no genuine issue of material fact exists regarding the existence of a duty and reverse the court of appeals' judgment.

## I. Background

JLB Builders, L.L.C. was the general contractor on a high-rise construction project in Dallas. JLB subcontracted the concrete work to Capform, Inc. through a contract executed in October 2013. Jose Hernandez, a Capform employee, was injured on the job on December 5, 2013. That day, Hernandez was a member of the Capform crew erecting a concrete column. Hernandez was standing on a "rebar tower" to guide the placement of a concrete form, which was suspended from a crane and was being lifted over and placed around the tower. The wooden braces supporting the tower were secured to the ground with nails. Either from wind or from the concrete form's contact, the tower detached from the ground and fell, landing on Hernandez's legs as he tried to jump off. At the time of the accident, Hernandez was supervised by Alejandro Molina, a Capform foreman. Juan Gutierrez, a Capform superintendent, was also present at the site when Hernandez was injured.

Hernandez sued JLB for negligence and gross negligence, alleging that JLB retained contractual and actual control over Capform's work and thus owed him a duty of care.[1] JLB moved for traditional and no-evidence summary judgment. In its traditional motion, JLB argued the evidence conclusively established that (1) it did not owe a duty to Hernandez, an employee of an independent contractor, because JLB neither exercised actual control over the means, methods, or details of Hernandez's work nor did it have the contractual right to control the work, and (2) JLB did not proximately cause Hernandez's alleged injuries. JLB asserted in its no-evidence motion that Hernandez could not provide any evidence to support the negligence

---

[1] Hernandez also sued JLB Partners, L.P., Sun Crane and Hoist, Inc., Auger Drilling, Inc., and D'Ambra Construction Corp., but the claims against those defendants are not at issue here.

elements of duty, breach, and causation. The trial court granted the motions, and Hernandez appealed the judgment with respect to the negligence claim only.

The court of appeals initially affirmed, holding that JLB owed Hernandez no duty because it did not control the manner, method, or means of Capform's injury-causing work. However, on en banc reconsideration, a divided court of appeals vacated that decision and reversed the trial court's judgment as to the negligence claim. 600 S.W.3d 485, 488, 498 (Tex. App.—Dallas 2020). The court held that a fact issue exists regarding whether (1) JLB exercised actual control and thus owed Hernandez a duty, (2) JLB breached that duty, and (3) JLB's breach proximately caused Hernandez's injuries. *Id.* at 497–98. We granted JLB's petition for review.

## II. Standard of Review

We review an order granting summary judgment de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To be entitled to traditional summary judgment, the movant has the burden to prove that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Hillis v. McCall*, 602 S.W.3d 436, 439–40 (Tex. 2020); TEX. R. CIV. P. 166a(c). By contrast, a party may obtain a no-evidence summary judgment when "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). A properly filed no-evidence motion shifts the burden to the nonmovant to present evidence raising a genuine issue of material fact supporting each element contested in the motion. *Id.*; *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). "[A] no-evidence summary judgment is improperly granted if the respondent brings forth more

than a scintilla of probative evidence to raise a genuine issue of material fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (citing TEX. R. CIV. P. 166a(i); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)).

## III. Discussion

When analyzing a negligence claim, we first ask whether the defendant owed the plaintiff a duty.[2] *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). Whether JLB owed Hernandez a duty is governed by our law concerning a general contractor's duties to a subcontractor's employees.[3] As a general rule, one who employs an independent contractor has no duty to ensure that the contractor safely performs its work. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020). However, an exception to this rule arises when "the employer retains some control over the manner in which the contractor performs the work that causes the damage." *Id.* (quoting *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006)); *see also Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) (adopting RESTATEMENT (SECOND) OF TORTS § 414 (1977)).[4] A plaintiff can prove the requisite control by establishing that the general

---

[2] The elements of negligence are duty, breach, causation, and damages. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 352 (Tex. 2015). Here, the issue of duty is dispositive.

[3] The same legal principles govern the duty owed by an owner or occupier of land. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985) ("A general contractor on a construction site, who is in control of the premises, is charged with the same duty as an owner or occupier."). The nature of the duty depends upon whether the injury arises from defects existing on the premises when the subcontractor entered or defects the subcontractor created by its work activity. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002) (citing *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225 (Tex. 1999)). Hernandez argues that his injury arose from the work activity.

[4] Section 414 states:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1977).

contractor either actually controlled the manner in which the subcontractor performed its work or had a contractual right to do so. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002) (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999)).[5] In either case, the "control must relate to the condition or activity that caused the injury." *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997). Further, the control retained or exercised by the general contractor must "extend[] to 'the means, methods, or details of the independent contractor's work.'" *Arredondo*, 612 S.W.3d at 295 (quoting *Bright*, 89 S.W.3d at 606); *see also Chapa*, 11 S.W.3d at 156 (noting that a general contractor "must have some latitude to tell its independent contractors what to do, in general terms, . . . without becoming subject to liability").

## A. Actual Control

We begin with the evidence regarding actual control. In its summary judgment motion, JLB cited Capform superintendent Gutierrez's testimony that (1) JLB did not tell him how to instruct the Capform employees and (2) no one from JLB told him how to install the braces that were in place to support the rebar tower. JLB also offered Hernandez's testimony that no one from JLB told him how to set the form, platform, or column and that no one from JLB directed him to set the platform or climb onto the rebar tower on the day of the accident. Hernandez further testified that he did not see any JLB personnel that day before the accident occurred and that he does not know if JLB knew that the braces were attached to the ground with nails instead

---

[5] If the contractual right to control a contractor's work exists, a duty arises regardless of whether actual control is exercised. *Bright*, 89 S.W.3d at 606 ("It is the [contractual] right of control, and not the actual exercise of control, which gives rise to a duty to see that an independent contractor performs work in a safe manner." (citation and internal quotation marks omitted) (alteration in original)).

of rebar, if JLB caused the accident, or how JLB was involved—if at all—with the placement of the braces.

Hernandez responded to JLB's motion with evidence that JLB supervisors were on-site at all times (though none were in the area where Hernandez was injured when the accident occurred), conducted daily safety inspections, inspected Capform's work, and had the authority and responsibility to require subcontractors to modify practices JLB believed to be unsafe. Hernandez argued that JLB knew on the day of the accident that Capform workers would be raising and climbing onto the rebar towers, attaching the concrete forms to the towers, and pouring concrete. Further, JLB's on-site supervisors "were aware that the double stack rebar towers could be knocked over by a particularly strong gust of wind, or if impacted too hard, by the concrete form as the crane swung it into place." Molina attested in an affidavit that the wind speed was "about 15–25 miles per hour" on the day of Hernandez's injury, and Gutierrez testified that Capform employees "have to continue to work" if the wind speed is lower than 20 or 25 miles per hour.

In holding that a fact issue on actual control existed, the court of appeals relied on "evidence [that] JLB retained control over the daily schedule, the order in which the work was to be done, the mandatory use of safety harnesses, and when the crane would be on-site." 600 S.W.3d at 497. The court further relied on testimony from JLB's chief operating officer, Paul Johnston, that (1) JLB inspects for safety every day, (2) on the day Hernandez was injured, JLB supervisors were on-site, and (3) JLB supervisors were aware that the towers could fall over if they were improperly braced, hit by a strong wind, or hit by a crane. *Id.* The court also noted

6

"some evidence . . . that there was sufficient wind that day to have made the work more dangerous and JLB knew of the wind and the increased danger." *Id.*

In this Court, JLB asserts that actual control is not demonstrated by the evidence that JLB periodically had safety inspectors on-site, required subcontractors to use safety harnesses, globally managed the daily schedule and the order of work, and might have known the subcontractors were using a crane on what may have been a windy day. JLB contends that the evidence on which the court of appeals relied demonstrates only general supervisory authority, not control over the specific work being performed. Hernandez maintains that JLB's safety requirements and inspections, scheduling of Hernandez's work on the day he was injured, and requirement that Capform's work be performed in windy conditions create a fact issue as to actual control. Even considering the evidence in the light most favorable to Hernandez, we cannot agree with his position.

As an initial matter, we recognize the well-settled rule that an employer's "general right to order work started and stopped" and "to direct when and where the work [i]s done" does not give rise to a duty of care. *Arredondo*, 612 S.W.3d at 295 (citing *Chapa*, 11 S.W.3d at 155; *Fifth Club*, 196 S.W.3d at 791–92). That JLB controlled the overall timing and sequence of work being performed by the various independent subcontractors merely indicates that JLB was performing the duties of a general contractor. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 450 (Tex. 2009) ("The general contractor hires subcontractors (*e.g.* plumbing, electrical, etc.), coordinates all work . . . .") (quoting *General Contractor*, Black's Law Dictionary (5th ed. 1979)). As we explained in *Bright*, to give rise to a duty, the control exercised must extend to the timing and sequence of the particular independent contractor's

7

work, such as which of the subcontractor's employees "should perform what task and at what point in time." 89 S.W.3d at 609; *see also Redinger*, 689 S.W.2d at 418 (holding that the general contractor owed a duty of reasonable care where it instructed a plumbing subcontractor's employee to perform a specific task immediately, resulting in the employee's being injured by a tractor another subcontractor was operating in the area).

Here, no evidence indicates JLB exercised any control over the timing or sequence of Capform's employees' work. Indeed, Gutierrez testified that Capform had complete control over its employees and that JLB gave them no instructions on how to do the job. Hernandez testified that Molina, Capform's foreman, told him what work to do and how to do it on the day of the accident, and no one from JLB gave him any instructions that day. Hernandez references his additional testimony that he had previously seen JLB supervisors talking to Capform's foremen and that the supervisors "appear[ed] to be giving instructions as to how our jobs were to be done." Without more, evidence of what JLB generally "appeared" to be doing is no evidence that it was exercising actual control over the details of the injury-causing work. *See Bright*, 89 S.W.3d at 607 ("[T]he control must relate to the injury the negligence causes.").

Turning to JLB's safety requirements, we first note that, as the court of appeals recognized, the mere presence of a general contractor's safety employee at the work site does not give rise to "a duty to an independent contractor's employees to intervene and ensure that they safely perform their work." *Chapa*, 11 S.W.3d at 157. While "an employer who gives on-site orders or provides detailed instructions on the means or methods to carry out a work order owes the independent contractor employee a duty of reasonable care to protect him from work-related hazards," *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998), there is no

8

evidence that JLB provided any instructions regarding the placement of the concrete form or securing the rebar tower. To the contrary, as discussed, the evidence demonstrates that JLB did *not* give Capform such instructions and that Capform employees instead handled securing the towers and placing the concrete form.

Further, Hernandez's reliance on JLB's specific requirement that workers use safety harnesses is misplaced. A general contractor that promulgates mandatory safety requirements and procedures owes only a narrow duty to ensure that those requirements and procedures generally do not "unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* at 358. Hernandez cannot plausibly contend that requiring the use of safety harnesses while working at considerable heights generally increases the risk or severity of injury. *See id.* at 357–58 (holding that a safety regulation prohibiting the use of A-frame ladders as lean-to ladders—that is, requiring that such ladders be used only as intended—did not give rise to a broad duty to ensure the safety of subcontractors' employees despite the fact that improper use of the ladder would have been safer under the specific circumstances). Nor does Hernandez contend that the required safety harnesses were themselves unsuitable for their intended use. *See Lee Lewis*, 70 S.W.3d at 784 (holding that a general contractor that expressly approved a faulty fall-protection system owed a duty commensurate with the control it exercised).[6]

Hernandez also argues that JLB knew the work conditions were dangerous and nevertheless ordered Capform to continue the work. A duty arises if a general contractor knows

---

[6] We note that, as the dissent in the court of appeals recognized, no evidence indicates that JLB actually instructed Hernandez to use a safety harness while performing the work in question. 600 S.W.3d at 500 n.2 (Bridges, J., dissenting). A provision in the contract requires that Capform employees use safety harnesses "when welding or cutting above ground or floor levels [where] there are falling hazards," but Hernandez was doing neither when he was injured.

9

of an unsafe condition and specifically approves or requires the work despite the unsafe condition. *Bright*, 89 S.W.3d at 609. Thus, a general contractor who, while observing a safety hazard firsthand, directly orders a subcontractor's employee to perform the injury-causing task incurs a duty with respect to the task's performance. *See Redinger*, 689 S.W.2d at 418. Likewise, evidence showing a general contractor personally observed a safety hazard and nonetheless approved of continuing the work raises a fact issue as to actual control. *See Lee Lewis*, 70 S.W.3d at 783–84. However, absent a specific contractual requirement to do so, a general contractor has no affirmative duty to take action upon learning of an independent contractor's employee's unsafe conduct. *See Chapa*, 11 S.W.3d at 157.

Hernandez asserts that a fact issue exists regarding whether JLB knew of unsafe conditions and specifically ordered the work to continue, citing (1) his testimony that JLB observed Capform's work in the days before the injury, saw they were using wooden supports, and "could watch" as the supports were nailed to the ground, (2) Molina's testimony that it was windy on the day of the accident,[7] and (3) Johnston's testimony that JLB supervisors were aware rebar towers could fall if not properly braced or if hit by a strong wind. However, there is no indication that JLB was aware that the wind posed a particular danger that day, and the testimony that JLB employees "could watch" the supports being secured is not evidence that they did so or that they were aware the supports were improperly secured. Even if it were, no evidence indicates that JLB ordered the work to continue despite such knowledge. To the contrary, Gutierrez testified that he, Molina, and the crane operator (all Capform employees) each had the

---

[7] Though we credit the evidence in Hernandez's favor, we note that Hernandez himself testified that it was not windy on the day he was injured.

10

right to *stop* the work if it was too windy.  Further, Johnston testified that JLB supervisors were on site that day, but not in the area, and Hernandez himself testified that he saw no JLB employees until after the accident.[8]  This evidence stands in stark contrast to the cases on which Hernandez relies, in which the general contractors exercised detailed control over the injury-causing work.  *See, e.g.*, *Morales v. Alcoa World Alumina L.L.C.*, No. 13-17-00101-CV, 2018 WL 2252901, at *1, *3–4 (Tex. App.—Corpus Christi–Edinburg May 17, 2018, pet. denied) (mem. op.) (holding that evidence that the general contractor provided detailed instructions regarding the pipe work the independent contractor's employee was conducting when he was injured—down to the order in which bolts needed to be removed—amounted to some evidence that the general contractor controlled the manner in which the work was performed); *Hernandez v. Amistad Ready Mix, Inc.*, 513 S.W.3d 773, 775, 778 (Tex. App.—San Antonio 2017, no pet.) (holding, in a case involving a subcontractor's employee who was injured when he fell from a forklift operated by a co-worker, that a fact issue existed regarding the general contractor's control where the general contractor provided the forklift and the pallet on which the injured employee was standing, knew the employees were not using fall-protection equipment, and had disposed of the forklift's previously installed "safety basket" attachment).

In sum, Hernandez failed to raise a fact issue as to whether JLB exercised actual control over Capform with respect to the injury-causing work.  The court of appeals erred in holding otherwise.

---

[8] Hernandez contends that JLB was "determined to keep the project on schedule and have the work done that day, regardless of the conditions, and instructed Capform to place the rebar tower and concrete form that day so the concrete could be poured on schedule."  But the evidence he cites does not support those broad assertions, and we have found no other support for them in the record.

11

## B. Contractual Control

As noted, even in the absence of a general contractor's exercise of actual control over the details of an independent contractor's work, a duty to ensure safe performance may arise if the general contractor retains the *right* to such control. *Arredondo*, 612 S.W.3d at 295. The court of appeals did not reach the issue of whether the contract between JLB and Capform gave JLB the right to control the pertinent work, but we will address it in the interest of judicial economy. *See State v. Morello*, 547 S.W.3d 881, 888 (Tex. 2018).

The contract required Capform to furnish all supervision of its employees and designated Capform "solely responsible for the acts and omissions of its employees." It provided that JLB had "no authority to direct, supervise or control the means, manner or method of construction of the Work" and that Capform was "responsible for the manner and means of accomplishing the Work." These provisions clearly do not confer a right to control. *See Chapa*, 11 S.W.3d at 156 (holding no contractual right to control existed where the contract provided that the subcontractor "would furnish any and all supervision over its employees and . . . 'shall perform as an independent contractor'").

The contract further made Capform "responsible for initiating, maintaining and supervising all safety precautions and programs in its Work," obligated Capform to "conduct inspections to determine that safe working conditions and equipment exist," and provided that Capform "accepts sole responsibility for providing a safe place to work for its employees." However, Hernandez argues that other provisions of the contract regarding safety counteract those terms. Specifically, the contract required Capform employees to comply with numerous safety procedures, including a detailed "Fall Protection Plan" that mandated safety harnesses

12

under certain circumstances. It further required Capform to provide safety certifications and a safety plan for the crane it used for the work. As discussed, however, requiring compliance with safety procedures does not give rise to a duty to an independent contractor's employees so long as those procedures do not "unreasonably increase, rather than decrease, the probability and severity of injury." *Id.*; *see also Bright*, 89 S.W.3d at 607 (rejecting the argument that the premises owner's requirement that its independent contractor comply with the owner's safety rules and regulations gave rise to a contractual right to control the work). Hernandez highlights JLB's safety procedures but makes no effort to explain how they increase the probability and severity of injury.

Hernandez also emphasizes JLB's status under the contract as the "controlling employer" with "general supervisory authority over the worksite." To that end, JLB had control over its subcontractors' work schedules via the following provisions:

> Contractor may, from time to time, provide work schedules or directions to Subcontractor, which work schedules or directions may from time to time be changed or modified in whole or in part by Contractor, and Subcontractor agrees to comply with and perform according to the requirements of any then current work schedules or directions.
>
> . . . .
>
> Subcontractor will, when required by Contractor, submit a detailed progress schedule covering the Work to be performed hereunder, conforming to the requirements of Contractor's work schedule or as otherwise directed by Contractor. . . . Subcontractor's failure to comply with work schedules or directions will constitute a default under this Agreement.

The contract further required Capform to "coordinate with [JLB] in scheduling and performing [Capform's] Work to avoid conflict, delay in or interference with the work of [JLB], other subcontractors or Owner's own forces."

13

This type of general supervisory authority with respect to subcontractor scheduling is precisely what does *not* constitute the kind of control over the means, methods, and details of a subcontractor's work that gives rise to a duty of care. *Bright*, 89 S.W.3d at 609; *see also Arredondo*, 612 S.W.3d at 295 (explaining that a general right to order an independent contractor's work started and stopped, to direct when and where the work is done, or to require that work be done by a certain time does not give rise to a duty of care). Rather, as discussed, it is consistent with the typical role of a general contractor. Hernandez points to no provisions governing how Capform should perform the work relating to placement of the concrete form, including securing the rebar tower, and we thus see no indication that JLB's supervisory control extended to the means and methods of Capform's work or "relate[d] to the condition or activity that caused the injury." *Olivo*, 952 S.W.2d at 528; *see also Shell Oil Co. v. Khan*, 138 S.W.3d 288, 295 (Tex. 2004) (holding that mandating a particular result by a certain time is no evidence of a contractual right to control "who should do th[e] work or when").

Accordingly, we hold as a matter of law that the contract did not provide a basis for imposing a duty of care on JLB to ensure the safe performance of Capform's work. We thus reject Hernandez's argument that the contract provides an alternative basis to affirm the court of appeals' judgment.

## IV. Conclusion

JLB owed Hernandez no duty as a matter of law, and the court of appeals erred in reversing summary judgment in JLB's favor on Hernandez's negligence claim. Accordingly, we reverse the court of appeals' judgment and render judgment that Hernandez take nothing from JLB.

14

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** May 7, 2021